**People of the State of Illinois, Plaintiff-Appellee, v. Revlon, Inc. and Abbey Drugs, Inc., Defendants-Appellants.**

**Gen. No. 51,850.**

First District.

September 25, 1968.

Friedman, Koven, Salzman, Koenigsberg, Specks & Homer, of Chicago (Sheldon Karon, Joseph A. Spitalli, and Stephen C. Shamberg, of counsel), and Paul, Weiss, Rifkind, Wharton & Garrison, of New York, N. Y. (Jay H. Ropkis and Robert L. Laufer, of counsel), for appellants.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Thomas Burnham, Assistant State's Attorneys, of counsel), for appellee.

STOUDER, J.

This is a criminal action initiated in the Circuit Court of Cook County in April 1965, on the complaint of Clairol, Inc., alleging that Revlon, Inc. and Abbey Drugs, Inc., defendants-appellants, violated the Illinois Trade Mark Statute, chapter 140, section 25, Ill Rev Stats 1963. The issues were determined by the court without a jury and this appeal follows from the judgments of the court finding each defendant guilty and assessing each a fine of $200.

The facts are undisputed and the evidence presented is quite simple. One of the witnesses testified to the purchase of a package of "Revlon Colorsilk," a permanent hair dye which is one of defendant Revlon's products. The package was introduced as an exhibit. On the carton containing the hair dye, the product within was described as a Revlon product in large letters on the front, back, sides, top and bottom. In a column on one side of the carton, the various color shades of the Revlon hair dye are indicated and in the smallest letters appearing anywhere on such carton such color shades are compared with those of "Miss Clairol Hair Color Bath." It is the reference to "Miss Clairol Hair Color Bath" which is the basis of this proceeding.

Other witnesses for the People testified that "Miss Clairol Hair Color Bath" with a crown in the background,

464

(such crown not appearing on the Revlon carton) is the registered trademark regularly used by Clairol, Inc. and further that Clairol had granted no license to Revlon for the use of such trademark.

The defendants presented only one witness, the Associate Research Director of Revlon. It was admitted that Revlon had not received permission from Clairol to use the latter's trademark. Revlon, although an established producer of cosmetics, did not enter the retail market in permanent hair dye until early in 1965, when it introduced "Colorsilk," a product designed to compete with Clairol's already established product "Miss Clairol Hair Color Bath." Permanent hair dye is as the description implies, permanent. Once the dye has been applied to the hair the result cannot be changed except by cutting off the dyed hair or by redying. Because of the nature and effect of the dye it can only be reapplied infrequently. The result which may be obtained by the application of a particular shade of hair dye varies from individual to individual and depends upon the natural color and condition of the hair, as well as its previous treatment. Thus a familiar result is sought by the individual user. According to the witness, this familiarity of result is promoted by a common trade practice of using color comparison charts whereby the color shade to be expected from one company's product is compared with the result expected from a competitor's product. The witness identified forty-five hair dye color comparison charts used and distributed for many years by most of the major companies. Of such color charts three were issued by Clairol comparing its product with those of other established competitors (not including Revlon). Four of the charts were those issued by Revlon (not relating to the product "Colorsilk") comparing its product with that of Clairol and according to the witness no communication had ever been received from Clairol regarding such color comparison charts.

465

To demonstrate that in the hair dye industry the use of color comparison charts referring to competitors' products and trademarks was not atypical, the defendants introduced into evidence seventy-four products recently purchased in New York or Chicago which included a reference to a competitor's name or trademark. Defendants also introduced seventy-four advertisements which in the promotion of a product referred to the names and trademarks of competitors.

In seeking to reverse the judgments of the trial court, the defendants have made numerous assignments of error including improper application of statutes, violations of constitutional rights and failure to prove essential elements of the offense charged. In our view of this case the propriety of the judgments depends on the construction of the applicable statutory provisions.

In substance the complaint charged Revlon used Clairol's registered trademark without the latter's consent. The charge is based on a violation of section 25, chapter 140, Ill Rev Stats 1963, which provides, "Every person who shall use or display a trade-mark of which he is not the lawful owner in any manner not authorized by such owner shall be deemed guilty of a misdemeanor. . . ." The narrow issue is whether the statute intends to proscribe conduct in the absence of any deception, namely, without regard to the intent, purpose or result of such conduct.

In support of the judgment of the trial court, the People argue that the court properly construed the aforementioned section of the statute as requiring per se application regardless of the intent, purpose or effect of the conduct of the defendant and reliance is placed upon the language of the section itself, other statutory provisions and the public policy of the State.

Section 25, chapter 140, Ill Rev Stats 1963, was enacted in 1955, as a part of the general revision of chapter 140, Trade Mark Act of 1891. At the time of the revision

of chapter 140 in 1955, the legislature also repealed section 288, chapter 38, enacted in 1953. Such section 288 provided, "When a person uses any peculiar name, letters, marks, device or figures, cut, stamped, cast or engraved upon, or in any way attached to or connected with any article manufactured or sold by him to designate it as an article of peculiar kind, character or quality, or as manufactured by him, whoever shall, without his consent, use the same or any similar names, letters, marks, devices, or figures for the purpose of falsely representing any article to have been manufactured by him, or to be of the same kind, character or quality as that manufactured or sold by the party rightfully using the same, shall for each offense be fined not exceeding $200." The People argue that by repealing section 288, chapter 38, Ill Rev Stats 1953, and by failing to reenact any similar provision such legislative procedure represents a deliberate intent to eliminate the requirement of deception as an element of the offense.

We do not ascribe such significance to the repeal of section 288, chapter 38, Ill Rev Stats 1953. Although section 288, chapter 38 was enacted in 1953 such provision derived from previous sections 115 and 116 of chapter 38, which were in effect in 1891 at the time of the adoption of the Trade Mark Act of 1891, (chapter 140). In the first place if the legislature intended to eliminate deception as an element of a trademark violation it could have done so by merely eliminating "falsely representing" from section 288, which it did not do. In the second place, the purpose and intention of the legislature in repealing section 288 is evident from and explained by other considerations unrelated to the view asserted by the People. Section 288 and prior sections 115 and 116 of chapter 38, were applicable to trademarks whether registered or not. White v. Wagar, 83 Ill App 592. The Trade Mark Act of 1891 (chapter 140) was applicable to registered trademarks only. Vincendeau v. People, 219

467

Ill 474, 76 NE 675. The legislature in its 1955 revision of chapter 140 provided in section 21 that "Nothing herein shall adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law," thereby making the provisions of chapter 140 applicable to trademarks whether registered or not. Under such circumstances the continuance of any provision relating thereto in chapter 38, became unnecessary. In the third place, such argument assumes that deception was not an essential element of the offense under the Trade Mark Act of 1891 (chapter 140) or if so included was not continued in the 1955 revision of chapter 140. As we shall later see, neither of these assumptions can be supported.

Since there are no cases construing or applying section 25, chapter 140, Ill Rev Stats 1955, it is necessary and appropriate that we consider the nature of a trademark, the development of our theories relating thereto and the relation of such section to other sections of the 1955 revision of chapter 140 as well as to prior statutory provisions. Sections 24 and 25 of the 1955 revision of chapter 140 in effect in 1963, are derived substantially from sections 2 and 5, respectively, of the Trade Mark Act of 1891 (chapter 140, Laws of 1891). Present section 24 of chapter 140 provides, "Whoever counterfeits or imitates any trade-mark of which he is not the rightful owner or in any way utters or circulates any counterfeit or imitation or knowingly sells or disposes of or keeps or has in his possession, with intent that the same shall be sold or disposed of, any goods, wares, merchandise, or other product of labor to which any such counterfeit or imitation is printed, painted, stamped or impressed, or knowingly sells or disposes of any goods, wares, merchandise or other product of labor contained in any box, case, can or package to which or on which any such counterfeit or imitation is attached, affixed, printed, painted, stamped or impressed, or keeps or has in his possession with in-

tent that the same shall be sold or disposed of, any goods, wares, merchandise or other product of labor in any box, case, can or package to which or on which any such counterfeit, or imitation is attached, affixed, printed, painted, stamped or impressed, shall be punished by . . ." Former section 2, chapter 140, Laws of 1891 provided, "Whoever counterfeits or imitates any such label, trademark, term, design, device or form of advertisement, or sells, offers for sale or in any way utters or circulates any counterfeit or imitation of any such label, trade-mark, term, design, device or form of advertisement, or knowingly uses any such counterfeit or imitation, or knowingly sells or disposes of or keeps or has in his possession, with intent that the same shall be sold or disposed of, any goods, wares, merchandise, or other product of labor to which any such counterfeit or imitation is attached or affixed, or on which any such counterfeit or imitation is printed, painted, stamped or impressed, or knowingly sells or disposes of any goods, wares, merchandise or other product of labor contained in any box, case, can or package to which or on which any such counterfeit or imitation is attached, affixed, printed, painted, stamped or impressed or keeps or has in his possession with intent that the same shall be sold or disposed of, any goods, wares, merchandise or other product of labor in any box, case, can or package to which or on which any such counterfeit or imitation is attached, affixed, printed, painted, stamped or impressed, shall be punished by . . ." Initially it should be noted that trademark is not defined in chapter 140 of the Trade Mark Act of 1891. Section 2 describes the interest or property right with respect to which conduct is proscribed as ". . . label, trade-mark, term, design, device or form of advertisement. . . ." Section 23 of the 1955 revision of chapter 140, defines trademark as, "Trade-mark means anything adopted and used by a person to identify goods made, sold, produced or distributed by him or with his authoriza-

tion and which distinguishes them from goods made, sold, produced or distributed by others." Thus it can be seen that the only substantial difference between present section 24 and prior section 2 is the employment of the term "trade-mark" (defined in section 23) as the interest to be protected, for the previous language relating to labels, trademarks and forms of advertisements. This change or substitution is of utmost significance and importance since its full import involves considerations basic to an understanding of the provisions of the Trade Mark Act of 1891 and the 1955 revision.

Historically our concepts concerning trademarks are of fairly recent origin having developed during the last one hundred years. The Trade Mark Act of 1891 was enacted at an early stage in the evolution of trademark law and the importance of trademarks has increased as our system for the mass distribution of goods also has increased. The definition of trademark (section 23, chapter 140, Ill Rev Stats 1955) may be said to be the generally accepted common-law definition of a trademark. Such definition has, however, evolved over the years and it would appear that the Trade Mark Act of 1891 (chapter 140) does not reflect the concept of a trademark as it is presently understood and defined in the 1955 revision. The implications dependent on such definition have not always been clearly understood and applied. By its nature a trademark is symbolic, representative and intangible. It derives its benefit or value by imitative reproduction in association with the goods or services it is designed to promote. It has sometimes been confused with the agency of its communication. Lack of a clear awareness as to the true nature of a trademark interest has led to the use of imprecise language thereby contributing to ambiguity or misconception. A trademark is not a "label" or a "form of advertisement." They are only the means by which the symbolic identification represented by a trademark is communicated. The 1955 revision of chapter 140, by

defining trademark and incorporating such definition by reference, delineates the nature of a trademark from the agencies or instruments of its communication.

It would appear that the lack of a clear appreciation as to the nature of a trademark in section 2 (chapter 140, Laws of 1891) may have led to an uncritical adoption of language describing the conduct proscribed in the first clause of such section, such section provides "Whoever counterfeits or imitates any such label . . . ." Although "counterfeits or imitates" is frequently used with the disjunctive implying similar or legally equivalent meaning, such is not the case. "Counterfeit" means "false representation" or "imitation with intent to deceive," thus it may be said that something which is counterfeit is an imitation but it is more than an imitation, it is imitation plus deception. 10 Words & Phrases, 40. For example a painting may be copied or imitated but it will be a counterfeit only if it is represented to be the original. So long as the copy is represented as a copy or imitation it is not a counterfeit. White v. Wagner, 185 Ill 195, 57 NE 26, recognized that an imitated label was not a forged instrument either at common law or by statute. As set forth in White, supra, the essence of the injury to the property interest conferred by a trademark and an owner thereof was the deception of the person relying thereon. See also People v. Stricker, 258 Ill 618, 102 NE 216. Deception does not arise from mere imitation of a trademark but does arise from imitation and use in connection with the promotion of goods or services. The further provisions in section 2 (chapter 140, Laws of 1891) recognize the requirement of deception by describing imitation or counterfeit in connection with various phases of the promotion and sale of goods or services. Thus it may not be inappropriate to describe the violation in terms of "counterfeit" if it be understood that such term includes the element of deception arising from the misrepresentation of identity. Section 24 of the 1953

revision retains the language "counterfeits or imitates" as a general proscription of conduct as well as specifying acts or conduct in which "counterfeited or imitated" trademarks are employed. As we have said before, "imitation" is included in the term "counterfeit" and hence its meaning being limited thereby imitation alone can not be said to establish any misconduct. However where imitation is described in connection with other acts which do in fact describe misrepresentation of the identification conveyed by a trademark, deception does occur.

It also may be said that "counterfeit" is sometimes used in opposition to "genuine" and something which is "counterfeit" is frequently described as "not genuine." This concept apparently led to the adoption of section 5, chapter 140, Laws of 1891, a predecessor to section 25, chapter 140 of the 1955 revision. Section 5 provides "Every person who shall use or display the genuine label, trade-mark, or form of advertisement of any such person, association or union, in any manner not authorized by such person, union or association shall be deemed guilty of a misdemeanor. . . ." It would appear that this section was intended to be complementary to section 2 and apparently contemplated that if "counterfeit labels" should be proscribed, "genuine labels" could also be misused. Such intention represents a lack of appreciation of "counterfeit," meaning "imitation with intent to deceive" as applied to the imitation and use of a trademark. In the first place, it should be noted that section 5 continues to describe the interest to be protected in terms which fail to distinguish a trademark from the agency of its communication. In the second place the theory of "genuineness" in opposition to "counterfeit" has no meaning when applied to the misuse of a trademark. The interest in a trademark can only be exercised by imitation even by the owner. As a means of symbolic identification there can be no genuine trademark but only a reproduction thereof. In the third place, a term such as "genuine label" has no

472

particular application to a trademark violation since the essence of the offense is the sale or promotion of a product misrepresenting the product to be that of another. Such misrepresentation occurs even though labels printed by the owners thereof are used. It would appear that somehow or other the statute is concerned with the circumstance under which the labels are obtained such as theft. In our opinion although section 5 purports to describe an offense complementary or in addition to that described in section 2 it failed to do so.

The only changes of significance between section 5, chapter 140, Laws of 1891 and section 25, chapter 140 of the 1955 revision is that in the revision "trade-mark" is substituted for the phrase "genuine trade-mark, label or form of advertisement" and the phrase "use or display" is substituted for "display." It would appear to us that the drafters of the 1955 revision initially recognized the confusion in the 1891 Act between a trademark and the agencies of its communication and that the principal change derived from section 5 was intended to make the provisions of the revision consistent in this respect without awareness either of the previous ambiguity of section 5 or of the conflict in section 25 with the language of section 24, chapter 140, of the 1955 revision. It is our conclusion that since section 24 of the 1955 revision of chapter 140 retains the essential basis of the offense described in section 2, chapter 140, Laws of 1891, namely "counterfeits or imitates with the intent to deceive," section 25 is in hopeless conflict therewith and in our opinion fails to state an offense.

We believe this view is supported by other considerations relating to public policy. Prior to the decision in Lady Esther, Inc. v. Lady Esther Corset Shoppe, Inc., 317 Ill App 451, 46 NE2d 165, the misrepresentation or deception which was considered the gist of a trademark violation was the "palming off" of the product of one as being the product of another. The application of the misrepre-

473

sentation or deception rule was applied only in the case of competitors. In the Lady Esther case the theory of deception was extended to noncompetitors or to those cases where the use of another's trademark would probably result in the purchaser being confused or mistaken concerning the relation of the owner of the trademark to the product sold. The concept of deception was extended from one of purpose or intent to include result. It was this theory of deception which was adopted in the 1955 revision of chapter 140 in section 19, applicable to civil remedies. Under such circumstances it would be difficult to conclude that the legislature intended to eliminate the requirement of deception as the basis for a trademark violation.

For the foregoing reasons the judgments of the Circuit Court of Cook County are reversed.

Judgments reversed.

ALLOY, P. J. and CULBERTSON, J., concur.