58 CCPA

**TAC TECHNICAL INSTRUMENT COR-PORATION, Appellant,**

v.

**FISCHER & PORTER CO., Appellee.**

**Patent Appeal No. 8391.**

United States Court of Customs and Patent Appeals.

Nov. 19, 1970.

Rehearing Denied Jan. 14, 1971.

Frederick A. Zoda, Trenton, N. J., (Sperry & Zoda), Trenton, N. J., attorney of record, for appellant. Russell L. Law, Washington, D. C., of counsel.

John M. Calimafde, New York City, for appellee. Michael Ebert, New York City, (Sandoe, Hopgood & Calimafde), New York City, of counsel.

Before RICH, ALMOND, BALDWIN, LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board (abstract 157 USPQ 712) dismissing an opposition by appellant to the registration of the word-mark TAC-TIC, application serial No. 222,922, filed July 8, 1965, for "Analog Computer for Traffic Intersection Control."

Appellant's Notice of Opposition alleges ownership of the trademark TAC-TIC "for instruments and appliances of electrical, electromechanical and/or electronic construction, used for measurement, control, sensing, detection, testing, and signalling purposes." It claims use of said mark since "prior to June 11, 1965." By an amendment to its notice, appellant added an allegation of ownership of TACTIC as a service mark, used since prior to June 11, 1965, on a variety of services including consulting, advising, designing, and developing a vari-

ety of electronic instruments for ultrasonic inspection, testing, recording, data interpretation, material handling, and the like. A number of advertisements showing use of the word TACTIC as a service mark were attached. Appellant has no registration of TACTIC and relies on its alleged common law trademark rights which commenced in April 1962.

Both parties took testimony and placed in evidence paper exhibits.

■ The origin of the mark TACTIC with opposer was contemporaneous with its incorporation and adoption of its corporate name. TAC are the initials of "test and control," the type of instruments it intended to sell, and TIC are the initials of Technical Instrument Corporation. Combining the two results in TACTIC.

While we do not consider it important to the issue, as a matter of interest the evidently independent origin of TACTIC with applicant-appellee was the initial letters of the descriptive expression "transistorized analog computer for traffic intersection control." The time of adoption appears to have been November 1964. This traffic controller was a product of an independent branch of Fischer & Porter Co., whose principal activity, basically, is manufacturing process control instrumentation, for example, flow meters, telemetering equipment, etc.

The manager of appellee's separate digital apparatus division gave the following description of the traffic controller sold under the name TACTIC:

Q43. What kind of equipment is involved in the TACTIC transistorized analog computer for traffic intersection control? A. This is an electronic solid-state controller that takes its input from loop detectors, and the ones we have are called Tacdet loop detectors,[1] which detect the presence of the vehicle at the intersection, use information to compute various timing functions, and through solid-state switches, change the lights from green to amber to red, in accordance with traffic demand, eliminating as much as possible, wasted green time.

This is what they are striving for in traffic control today, to eliminate wasted green time by real time sensing of traffic demand and changing the signals either at an isolated intersection or a system of intersections accordingly.

The regular price of a TACTIC traffic controller is $1,895. On a promotion —one to a customer—they were sold for as little as $1,195. It was first announced to the trade in April of 1965. Customers are generally municipalities. It is sold through specially trained salesmen who visit traffic engineers, except for two locations where manufacturer's representatives are used. Sales of TACTIC controllers at the time of testimony had been 38 with orders on hand for about 10.

The testimony of both parties showed that each was in the early years of a new business venture, each started on a small scale, and each enjoyed steady growth. Neither has been competitively bothered by the other and this proceeding has primarily prospective significance. Opposer asserts, we think with reasonable justification, that registration of its mark by appellee may get in the way of the normal expansion of its business. In this connection it is noted that all of opposer's goods and services are marketed under its TACTIC mark.

The board found that opposer is the prior user and this finding is not contested. It found the sole issue to be whether the goods and services here involved are "so related that their sale under the identical mark 'TACTIC' would be likely to cause confusion or mistake or to deceive." It then answered the question posed by the issue in the negative on the ground that the goods and services pertained to "distinctly differ-

1. The detector is a large loop of insulated wire buried in the road which detects the presence of a vehicle.

ent fields of trade" and "have nothing whatever in common * * *."

We think the board viewed the situation too narrowly and looked only to what specific goods and services had already been "involved" up to the time of the testimony.

Opposer had firmly established, by use, its trademark rights in TACTIC for both goods and services. From a time prior to appellee's adoption of the mark those goods and services had steadily grown through the four years to June 1966 when testimony was taken. Albeit opposer is a small organization, it is shown to have advertised its goods and services on a national scale in trade publications which more than likely would reach some of the same personnel who would encounter appellee's traffic controllers, advertising, and salesmen. The goods of both parties are in the electronic and electromechanical fields. Particularly with respect to the services of opposer, they were shown to be as pleaded, "rendering consulting, advisory, design development, and inspection services in respect to a variety of electronic instruments." While appellee was adamant in insisting that its traffic controllers are not known as "instruments" by those concerned with them, nevertheless the Fischer & Porter Co. which makes and sells them is primarily an instrument company serving industry generally in that capacity. Its instruments, too, are electromechanical.

In this case where the marks are *identical* we think that, prospectively, likelihood of confusion or mistake to a substantial degree clearly exists. With the growth of both companies in accordance with their established trends to the date of testimony, that likelihood would necessarily increase. As we said in J. C. Hall Co. v. Hallmark Cards, Inc., 340 F.2d 960, 52 CCPA 981 (1965):

> *Present* sales and methods of distribution are not conclusive and do not, in our judgment, form a proper basis for finding lack of likelihood of confusion or mistake when the *identical* trade-

marks are used on the respective goods of the parties. [Emphasis ours.]

The decision of the board is reversed.

Reversed.