**SOFT SHEEN PRODUCTS, INC., Plaintiff,**

v.

**REVLON, INC. and Roux Laboratories, Inc., Defendants.**

No. 86 C 1753.

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1987.

Robert E. Wagner, Daniel N. Christus, Wallenstein, Wagner, Hattis, Strampel & Aubel, Ltd., for plaintiff.

John J. Cassidy, Jr., Jewel S. Lafontant, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Jay H. Begler, Andrew Galway, Liddy, Sullivan, Galway & Begler, Murray I. Franck, Lesley A. Moridian, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McGARR, District Judge.

This case came on for a hearing before the court on May 4, 1987, on the petition of plaintiff Soft Sheen Products, Inc. ("Soft Sheen") for injunctive relief against defendants Revlon, Inc. ("Revlon") and Roux Laboratories, Inc.'s ("Roux") alleged infringement of Soft Sheen's trademark and trade dress for hair care products designed principally for and sold to the ethnic community of black America. The court heard extensive evidence and argument on the subject and is in receipt of post-trial memoranda and proposed findings of fact and conclusions of law.

The findings of fact and conclusions of law of the court follow.

### FINDINGS OF FACT

*The Parties*

1. Plaintiff Soft Sheen is a Delaware corporation with its offices and principal place of business at 1000 East 87th Street, Chicago, Illinois 60619 (admitted, Answer to Complaint, Para. No. 1). Soft Sheen is a manufacturer of a line of hair care maintenance products especially designed for and directed to the black hair care market (Tr. 9). Soft Sheen's "Care Free Curl" line of products is directed to black wearers of a hair style known as the "curl look" (Tr. 9–10).

2. Defendant Revlon is a Delaware corporation with its offices and principal place of business at 767 Fifth Avenue, New York, New York 10153 (admitted, Answer to Complaint, Para. No. 2). Defendant Roux is a New York corporation with its offices and principal place of business at 3733 University Boulevard West, Jacksonville, Florida 32217–2134. Roux is wholly owned by Revlon.

*Soft Sheen's "Care Free Curl" Products*

3. In May, 1979, Soft Sheen began marketing in salons "Care Free Curl" hair care products directed to the "curl look" (Tr. 8; 87–89). About a year later, in 1980, these products were made available to mass re-

tail merchandisers (Tr. 87–88). The "curl look" is a hair style in which the naturally, tightly curled hair of blacks is first loosened or straightened, and then restyled into a larger curl (Tr. 9–10). The "curl look" hair style is generally obtained from a professional stylist, and requires maintenance products to retain the hair style (Tr. 9; 87–88).

4. Soft Sheen's products for the maintenance of the "curl look" hair style are sold at both professional outlets such as beauty salons, and at retail outlets, including beauty supply outlets, food or grocery stores, drug stores, and discount department stores (Tr. 193–194). These maintenance products include "Care Free Curl" brand Shampoo (PX–11), Instant Moisturizer (PX–164), Curl Activator (PX–190), and Gel (PX–209) (Tr. 302–303). "Care Free Curl" maintenance products, particularly the moisturizer and activator, have been sold to retail customers in beauty salons in a distinctive bright yellow and red container substantially identical to PX–164 since about August, 1979 (Tr. 85–89). The shampoo (PX–11) has been sold since at least July, 1980 (Tr. 22). The gel (PX–209) has been sold since at least 1983, and was marketed prior to the Revlon gel product (PX–8) (Tr. 138).

5. Soft Sheen's "Care Free Curl" bright yellow and red retail trade dress in dispute ("bright yellow and red trade dress") is substantially identical to PX–164, and comprises the following visual elements: a substantially cylindrical, bright yellow bottle; bold red graphics, substantially along the upper half of the bottle; and a red bottle cap. The overall colors and trade dress were chosen and have been synergistically and extensively promoted with a view toward distinctively identifying those colors and that trade dress with Soft Sheen (Tr. 76; 99–100; 134–135; 229). Soft Sheen has also obtained a U.S. trademark registration for the word/design mark "Care Free Curl" in red lettering on a yellow background (U.S. Trademark Registration No. 1.301,111; PX–158; PX–159; Tr. 90–92).

6. In 1985, Care Free Curl Shampoo (PX–11) was the top-selling ethnic shampoo. Within two years, it had dropped to the second-ranked shampoo in total sales (Tr. 254–257), while the Revlon product rose to first place.

7. Care Free Curl Instant Moisturizer (PX–164) and Care Free Curl Activator (PX–190) have been the overall top-selling ethnic hair care products, as evidenced by direct testimony and the commercial reporting service, Towne–Oller (Tr. 202–203; PX–178; 179; 180).

*Revlon's Competing Products*

8. Revlon, through its Roux subsidiary, sells a "Creme of Nature" Shampoo (PX–5), Instant Moisturizer (PX–188), and Moisturizing Gel (PX–8) in the ethnic market (Tr. 115–116.) Creme of Nature Shampoo was sold, between 1973 and 1984, in various trade dresses, none resembling a bright yellow cylindrical container having a red cap and also having bold red graphics substantially along the upper half of that cylinder (Tr. 873).

9. Among the variety of competing products marketed by both plaintiff and defendant, the evidence indicates a likelihood of confusion is limited to only two of them, that is, the Revlon Shampoo bottle and the Revlon Instant Moisturizer.

10. In late 1984, Revlon changed the trade dress of its shampoo bottle from the beige and maroon of PX–9 (Crane testimony p. 47) to the bright yellow and red of PX–5 (Crane testimony, pp. 17–18).

11. In early 1985, Revlon introduced an instant moisturizer (PX–188) in a bright yellow and red trade dress (Crane testimony p. 31).

12. Revlon's post-1984 trade dress for its competitive shampoo and instant moisturizer, as exemplified by PX–5 and PX–188, comprises the following visual elements; a substantially cylindrical bright yellow bottle; bold red graphics, substantially along the upper half of the bottle; and a red cap.

*Soft Sheen's Sales, Advertising, Promotion and Secondary Meaning*

13. From 1979 through 1986, Soft Sheen Products, Inc. has sold about $375,-000,000 of goods. An estimated 80–88% of such goods, or at least $300,000,000, were

sold in containers bearing Soft Sheen's bright yellow and red trade dress of PX–11 (Tr. 100–102). Through the end of 1984, Soft Sheen Products, Inc. sold about $203,-000,000 of goods, with at least 80% or $160,000,000 in sales, in Soft Sheen's bright yellow and red trade dress (Tr. 100–102).

14. Soft Sheen has engaged in extensive color advertising and promotion to establish, in the minds of consumers, an association betwen Soft Sheen and its bright yellow and red trade dress (Tr. 8; 169–191). In addition, since 1979, millions of shipping cartons (PX–191), which consumers can often see at retail stores, have been produced in the bright yellow and red combination (Tr. 93–94). Buttons, visors, sunglasses, T-shirts, wristbands, luggage, jogging suits, mugs, and other promotional items in bright yellow and red are distributed (Tr. 100; 170). Soft Sheen employees at trade shows wear yellow and red clothing (Tr. 100).

15. Virtually all of Soft Sheen's print advertising includes, and emphasizes, the bright yellow and red trade dress (PX–211–233) (Tr. 169–191). This print advertising has appeared in nationally distributed magazines, including magazines particularly directed to the black market, such as Ebony and Essence (Tr. 169–170; 171–172); in transit or bus advertising (Tr. 172); in counter-cards used in point-of-purchase display advertising (Tr. 170); and at trade shows (Tr. 100). Soft Sheen's print advertising and visual advertising has been nationwide in scope, appearing in as many as 100 markets (Tr. 180) and in national magazines (Tr. 169–170).

16. Soft Sheen sells its products through mass merchandisers, drug stores and chains, beauty supply stores, grocery stores, and department stores (Tr. 193; 301–302). In addition, Soft Sheen sells its professional products for attaining the "curl look" to professional beauticians (Tr. 121–122; PX–195). Consumers see the bright yellow and red trade dress of the professional product, which is virtually the same as that of the retail products, as that product is used and displayed in the beauticians' shops (Tr. 121–123). All of this rein-forces the consumer's association of the bright yellow and red trade dress with Soft Sheen (Tr. 122–123).

17. Print or visual advertising and promotion expenditures for the Care Free Curl line which bear the colors or the bright yellow and red trade dress were estimated at in excess of $40,000,000 since the line's 1979 introduction (Tr. 174).

18. Soft Sheen's overall sales, most of which have been in the Care Free Curl line, have risen at an amazing rate, from about $500,000 in 1979 to about $85,000,000 in 1986 (Tr. 100–102). The products in the Care Free Curl line in the bright yellow and red trade dress have been sold since 1979 (Tr. 86–89).

19. Soft Sheen has aggressively protected its trade dress. Various consent decrees, judgments or agreements have been obtained by Soft Sheen, in which parties agreed to stop using or were enjoined by the court from using bright yellow and red containers confusingly similar to Soft Sheen's bright yellow and red trade dress (Tr. 102–106; PX–167–174).

20. A secondary meaning survey was conducted by Mr. John Bunge, a professional marketing research consultant (Tr. 358; PX–235). The results of the secondary meaning survey were summarized in a report which was offered and received as Plaintiff's Exhibit 202 (Tr. 365; 374). A photograph depicting the stimulus used in the survey shows PX–201, which was a cylindrical, bright yellow bottle completely devoid of any identifying words (Tr. 361; 367–369). The cylindrical yellow bottle included a red cap and three spaced and stacked red bands, rather than the words "Care Free Curl," located substantially along the upper half of the cylinder (Tr. 361–362; PX–201).

21. Interviewers in Mr. Bunge's survey showed this stimulus to 539 respondents (Tr. 369; PX–202, p. 3). The survey respondents were black males and females, 16 years of age or older, who personally purchased the majority of hair care products for their family, and who purchased hair care products at least once every six months (PX–202, p. 3). Mr. Bunge conclud-

ed that, based upon his survey, 52.1% of all 539 respondents in the survey perceived the source of hair care products in bright yellow and red colors and as shown in PX–201 to be Soft Sheen Products or "Care Free Curl" (Tr. 369), and that secondary meaning had attached to the containers (Tr. 375).

22. As indicated Mr. Bunge (PX–202, p. 10), 385 of the 539 total respondents had an opinion as to the company or organization that puts out hair care products in the container depicted by the stimulus, PX–201. Of these 385 respondents, 281 or 73% believed that the company or organization that puts out hair care products in such a container was Care Free Curl or Soft Sheen (Tr. 375–376; PX–202, p. 10).

23. Mr. Bunge's survey disclosed that the dominant reason for perceiving the source of the unmarked container used as a stimulus (PX–201) to be Care Free Curl or Soft Sheen, or for perceiving an association or connection, were the colors and the color combination of bright yellow and red. More than eight out of every ten respondents who perceived the source of the unmarked container to be Soft Sheen or Care Free Curl did so because of the colors (PX–202, p. 12; Tr. 372–374).

*Likelihood of Confusion*

24. Likelihood of confusion is increased in view of the congruency in the marketing strategies of the Creme of Nature and Care Free Curl products. For example, both products are sold in beauty supply houses (Tr. 982), drug, and discount department stores (Tr. 9; Tr. 10–11; PX–160; PX–161; PX–162). Particularly, the products are sold in relatively small ethnic hair care areas of those particular stores (Tr. 117), and this proximity increases the likelihood of confusion between the products. Photographs have shown the nearness of the products on the shelves of various retail stores (PX–160, 161, 162). In one case, the Care Free Curl and Creme of Nature products were side by side in a Zayre store in Chicago (PX–160). Even defendants admit "instances" of the products, including the shampoos and moisturizers, appearing side by side in stores (Tr. 525).

25. Revlon markets its Creme of Nature products, including its shampoos and moisturizers, in the same trade channels (Tr. 311–312) and using the same kinds of promotional activities, including advertising in Essence and Ebony magazines (Tr. 194–195; Tr. 197; PX–118; PX–120), as does Soft Sheen.

26. The products sold by Revlon and Soft Sheen in the disputed trade dresses are generally low in price, selling in a range from about $3.00 to about $5.00 per item (Tr. 296; 982).

27. Defendant Revlon's President Bottner acknowledged that the instant moisturizers of the two companies are directly competitive (Bottner Dep. p. 117).

28. Revlon's assertion at trial that there is a meaningful difference between the shampoos and that they are not functionally interchangeable is of no merit.

29. Likelihood of confusion is also evidenced by Mr. Bunge's confusing similarity survey, PX–203. In establishing whether or not there is confusing similarity between two product containers, the inquiry was whether consumers perceive the actual Soft Sheen and Revlon containers to be from the same source or from a different source (Tr. 383–384). Any respondent who believed that the two containers are from the same source was deemed likely to be confused as to the origin of the products in the containers (Tr. 379–381). Hence, any respondent who believed that the containers were from the same source, even if that source is a source other than Revlon or Soft Sheen, was deemed likely to be confused as to the actual source of the products in the two containers (Tr. 383–384).

30. Questions 7 and 9 of the Likelihood of Confusion Survey questionnaire (see Appendix of PX–203) were asked after the respondents were shown, alternatively, the Soft Sheen Care Free Curl Conditioning Shampoo bottle and the Revlon Creme of Nature Detangling/Conditioning Shampoo bottle (Tr. 379–381). Of the 532 total respondents interviewed during the survey, 19 of these respondents believed that Exhibit W (Revlon Creme of Nature Shampoo)

and Exhibit B (Soft Sheen Care Free Curl Shampoo) were from the same source (see p. 111 and Table 22, p. 112 of PX–203; Tr. 383–384). Even though 10 of these 19 respondents believed that the source of both products was Revlon, or Johnson Products, or Ultra–Sheen, these respondents nevertheless believed that Exhibits B and W were from the same source. An additional 3 respondents believed that the "sources of Exhibits B and W to be Johnson (because of color, or Johnson making or associated with Soft Sheen) and Soft Sheen, or Johnson (because of Johnson making Creme of Nature) and Revlon" (PX–203, p. 111). Because their verbatim responses indicated that these 3 respondents apparently believed the source of both Exhibits B and W to be either Soft Sheen or Revlon, they were also deemed likely to have been confused as to the actual source of the products in the two containers (Tr. 427–428).

31. Among the total sample of 532 respondents, 172 respondents did not know the source, when asked, of Exhibit B, or Exhibit W, or both (PX–203, p. 116). These 172 respondents were then asked a "follow-up" question (Tr. 381, 384). The follow-up question was whether they thought that the products contained in Exhibits B and W were put out by the same company or organization or by different companies or organizations (PX–203, p. 116). Of these 172 respondents, 61 thought that the two products were put out by the same company or organization (PX–203, p. 116; Tr. 381–382; 384). These 61 were thus also deemed likely to have been confused, and were added to the total number of confused respondents (PX–203, p. 11, Tr. 384).

32. Accordingly, a total of 19, plus 3, plus 61, or 83 respondents, out of a total of 532 respondents in the survey, thought that the two products were put out by the same company or organization (PX–203, p. 11). Eighty-three respondents out of 532 respondents (15.6%) thus perceived the same source for Exhibit B (Soft Sheen Care Free Curl in a yellow and red container) and Exhibit W (Revlon Creme of Nature in a yellow and red container) (PX–203, p. 11).

33. Defendants' expert, Dr. Yoram Wind, criticized the calculations in the Bunge Likelihood of Confusion survey (PX–203). The testimony of Dr. Wind did not lessen the probative value of the Bunge survey in support of the court's conclusion that actual confusion has occurred.

*Non–Functionality and Dilution*

34. The colors bright yellow and red and the Care Free Curl bright yellow and red trade dress have been used by Soft Sheen primarily as a means of identifying the Care Free Curl goods sold under those colors with Soft Sheen Products, Inc. (Tr. 57–58; 99–100; 133–134). Soft Sheen has used these colors, and the bright yellow and red trade dress, in extensive promotions of its goods since at least 1980 (Tr. 186; 168–191; PX–211–233). This trade dress is clearly non-functional.

35. The bright yellow and red trade dress of PX–201, the unmarked container used as a stimulus in PX–202, the Bunge Secondary Meaning survey, served to distinguish the products sold in that trade dress as made by Soft Sheen, to over half of the survey respondents (Tr. 376–377; PX–202, p. 10, finding No. 1).

36. Because there were absolutely no markings identifying the manufacturer of the bottle used in the survey (Tr. 361; PX–201), it is apparent that consumers could not identify the source of that bottle except by independent recognition and association of the bright yellow and red trade dress with Soft Sheen.

37. Revlon has a great deal of marketing power (Tr. 312–313), and sells its Creme of Nature products over broad regions of the United States, as shown in the list of markets surveyed in Dr. Wind's survey (DX–20, p. 4). If Revlon's actions are allowed to continue, its nationwide distribution of the infringing bright yellow and red trade dress will cause the loss of or dilute the strong distinctiveness or source identification that Soft Sheen has attained for its own bright yellow and red trade dress (Tr. 119–120; 376–377).

38. Revlon has spent and continues to spend large amounts of money on consumer advertising in the media, including na-

tional magazines directed to the black market, such as Ebony and Essence (PX–120, PX–118, Tr. 194–197). Revlon has spent over $1,000,000 in advertising on the Creme of Nature line since 1984, including color ads showing the bright yellow and red trade dress in dispute (Tr. 840–841; PX–71; PX–77; PX–78).

*Knowledge and Intent*

39. Relevant to Revlon's knowledge of Soft Sheen's bright yellow and red trade dress and its intent to benefit from a confusingly similar trade dress was the testimony of Peter Madkin. Madkin was employed as an Assistant Marketing Manager and Assistant to the Vice President of Marketing—Retail at a division of Revlon Professional Products from February, 1980 to May of 1985 (Tr. 452). Mr. Madkin was employed by Revlon and was involved in discussions leading to the change to the Creme of Nature yellow and red bottle trade dress adopted in early 1985 (Tr. 463–467).

40. Mr. Madkin departed Revlon on an amicable basis, and was recommended by Revlon to prospective employers upon his departure (Tr. 452).

41. Mr. Madkin was present during numerous discussions at Revlon regarding the proximity of the Creme of Nature packaging to the Care Free Curl packaging (Tr. 463; 468). These discussions were held in the offices of Revlon employees, including Messrs. Givens, Roppolo, and Crane (Tr. 463).

42. A product display in Mr. Givens' office included various Soft Sheen Care Free Curl bottles, including the moisturizer and shampoo (Tr. 466), when the change to the Creme of Nature bright yellow and red trade dress was being discussed (Tr. 465). Thus, prior to adopting the Revlon Creme of Nature bright yellow and red trade dress, Revlon had actual knowledge of Soft Sheen's bright yellow and red trade dress.

43. During one of the discussions pertaining to the changeover to the Revlon yellow and red bottle, one of the concerns was that there might be a similarity to Soft Sheen's packaging (Tr. 465). Revlon's President Bottner responded that the pack-

aging might be close but, from a competitive standpoint, if a consumer picked up the Revlon package instead, it would be to Revlon's advantage, and would result in a consumer trial of Revlon's product (Tr. 465–466).

44. In pretrial discovery, a document responsive to Request No. 46 was identified as a memorandum from M. Franck, who is Revlon's in-house counsel (Tr. 4), to J. Givens, dated January 26, 1984. The existence of this document is further evidence that Revlon was aware of Soft Sheen's bright yellow and red trade dress at least as early as January 26, 1984, during the period when it was still contemplating adoption of the infringing bright yellow and red Revlon trade dress. The existence of this document further indicates that Revlon's officers and employees were at least aware of and concerned with a potential problem with the proposed bright yellow and red Revlon trade dress, in view of Soft Sheen's bright yellow and red trade dress. Again, notwithstanding this concern, Revlon subsequently adopted that bright yellow and red trade dress for its shampoo and its moisturizer.

45. Also indicative of Revlon's prior knowledge of Soft Sheen's bright yellow and red trade dress is the testimony of Revlon's Robert Crane. Crane admitted that, prior to its change to the bright yellow and red bottle trade dress, Revlon was aware of Soft Sheen's Care Free Curl products being sold in the bright yellow and red trade dress (Crane testimony pp. 61–63).

*Preliminary Injunction*

46. If permitted to continue, Revlon's distribution of Creme of Nature hair care products in bright yellow and red containers will destroy the exclusive source identification established in the minds of consumers that is provided by Soft Sheen's bright yellow and red trade dress (Tr. 119–120). That harm is irreparable.

47. Revlon will suffer no substantial injury if it is preliminarily enjoined from distributing or advertising its confusingly similar Creme of Nature bottles in the bright yellow and red trade dress, as Mr.

Givens at one time admitted that sales would not be substantially affected by a change to a yellow and blue or yellow and green trade dress (Tr. 923–924). Soft Sheen has no objection to the use of a bright yellow and blue trade dress (PX–165; Tr. 96), or to the prior trade dress used by Revlon (PX–9), to which Soft Sheen had never objected.

48. Revlon's ethnic hair care product sales are but a part of its overall, non-ethnic broadly based product line (Tr. 314–315); Soft Sheen depends on its ethnic hair care business, and its Care Free Curl line in the classic cylindrical bottle's trade dress amounts to at least 80% of its total business (Tr. 106–107; 101–102).

49. The public has an interest in freedom from confusion. Moreover, there is an interest in protection of trade dresses that are used by the public to identify sources of products, and it is clear that soft sheen's bright yellow and red trade dress (PX–201) is identified with Soft Sheen by the public (Tr. 376–377).

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter of this motion under the Federal Trademark Act, 15 U.S.C. Section 1121 (1982), and the Judicial Code, 28 U.S.C. Sections 1331 and 1338 (1982). Jurisdiction over Soft Sheen's claims under the Illinois common and statutory-law based unfair competition counts is premised on 28 U.S.C. Section 1338(b), such claim being joined to a substantial and related claim under the U.S. trademark laws.

2. Defendants Revlon, Inc. and Roux Laboratories, Inc. are found and do business in this district, and through their attorneys have appeared and argued their cause. The court therefore has personal jurisdiction over both Revlon and Roux. Venue is proper in this district, and is not challenged by Revlon.

3. To state a claim for trade dress infringement, false designation of origin, and deceptive trade practices under both the federal Lanham Act and the Illinois Uniform Deceptive Trade Practices Act (Ill. Rev.Stat. ch. 121½ Paragraphs 311–317 (1985)) ("UDTPA"), Soft Sheen must show that: (1) it has protectable rights in its Care Free Curl bright yellow and red trade dress; and (2) use by Revlon in commerce of its Creme of Nature bright yellow and red trade dress is likely to result in confusion, mistake or deception.

4. The trade dress of a container may function as a trademark for the products, and is thus protectable under Section 43(a) of the Lanham Trademark Act, 15 U.S.C. Section 1125(a) (1982).

5. One may demonstrate protectable rights in a trade dress by showing that it has acquired secondary meaning. In cases of trade dress infringement, the court must consider the total image of the plaintiff's product, package, and advertising and compare this with the defendant's image. Here, the product, packaging, and advertising vehicles of Soft Sheen and Revlon are very similar.

6. To establish secondary meaning, it is sufficient that the public is aware that the product comes from a single, though anonymous, source. The factors relevant on the issue of secondary meaning include the amount and manner of advertising, volume of sales, the length and manner of use, and consumer surveys. Here, Soft Sheen's continuous use of its bright yellow and red trade dress over the past seven years, its extensive advertising and promotion featuring its trade dress and its colors, its high volume of sales, and position as the leader in the black hair care market, the secondary meaning survey result, all overwhelmingly establish secondary meaning, in that the relevant consumers identify a bright yellow cylindrical container having both a red closure and red graphics substantially along the upper half of that cylinder as containing a Soft Sheen or Care Free Curl product. Although it is unnecessary for the public to be aware of the name of the manufacturer from which a product emanates in order for the trade dress of that product to have attained secondary meaning, here, over 50% of all respondents in the Bunge secondary meaning survey identified *by name* that the unmarked survey stimulus, PX–201, bearing the bright

yellow background and red graphics was made by Soft Sheen or Care Free Curl.

7. Plaintiff must prove only two things to show its right to relief under Section 43(a) of the Lanham Act: protectable rights in the trade dress, i.e., secondary meaning; and that there was a likelihood of confusion on the part of the consumer resulting from the infringer's use of the trade dress. Thus, Revlon's assertions at trial and in pretrial briefs that Soft Sheen must prove non-functionality are incorrect.

8. Soft Sheen's bright yellow and red trade dress is plainly non-functional.

9. In determining likelihood of confusion in trade dress cases, factors to be considered are the degree of similarity between trade dress in appearance and suggestion; the similarity of the product for which the trade dress is used; the areas and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's trade dress; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another. Applying these factors here, Revlon's Creme of Nature bottles are highly similar in appearance to Soft Sheen's bright yellow and red trade dress, and the infringing Revlon Creme of Nature bottle includes a bright yellow cylindrical bottle having bold red graphics substantially along the upper half of that cylinder and a red cap. With respect to product similarity, Revlon's and Soft Sheen's shampoos and instant moisturizers are interchangeable. Concerning the similarity in areas and manner of concurrent use, both Soft Sheen's Care Free Curl products, and the Revlon Creme of Nature products are sold nationwide, in the same types of stores, and, in some instances, side by side in the same section of these stores. Because of the low price of these items and their need for frequent, periodic replacement, the degree of care likely to be exercised by consumers is lower.

10. Where the goods are "substantially identical" and the trade channels are the same, the class of customers is the same, and both products are relatively inexpensive and frequently replaceable, "purchasers of such products have long been held to a lesser standard of purchasing care." Thus, here, consumers are less likely to exercise great care in making their selection of products.

11. A newcomer has a duty to avoid a trademark or trade dress that may be confusingly similar to a well-known trademark of a competitor and doubt as to whether confusion, mistake or deception is likely, is to be resolved against the newcomer, especially where the established mark is one which is well known and applied to an inexpensive product bought by all kinds of people without much care.

12. Configuration and appearance of a particular product or article may function as a trademark for the goods and therefore be proper subject matter for protection and injunctive relief under 15 U.S.C. Section 1125(a).

13. Under the Illinois antidilution statute, Ill.Rev.Stat. ch. 140 Paragraph 22 (1985), Soft Sheen has shown that its bright yellow and red trade dress is distinctive, and that Revlon's use of its Creme of Nature container dilutes that distinctiveness.

14. The court concludes that Revlon's use of a trade dress similar to that of Soft Sheen and including the bright yellow and red colors dilutes the distinctiveness of Soft Sheen's bright yellow and red trade dress, in violation of Ill.Rev.Stat. ch. 140 Paragraph 22.

15. Under Ill.Rev.Stat. ch. 140 Paragraph 23 (1985), "trademark" means "anything adopted and used by a [corporation] to identify goods made, sold, produced or distributed ... and which distinguishes them from goods made, sold, produced or distributed by others." Soft Sheen's bright yellow and red trade dress distinguishes the goods of Soft Sheen from those made, produced or distributed by others, and is thus a "trademark" under Illinois statutes. Accordingly, Revlon's use of its Creme of Nature trade dress for instant moisturizer and shampoo constitutes a violation of Soft Sheen's bright yellow and red trade dress

under Ill.Rev.Stat. ch. 140 Paragraph 24, and under Illinois common law.

16. Soft Sheen is likely to be irreparably harmed if Revlon is not enjoined from further distributing, advertising, selling and marketing its Creme of Nature Shampoo and Conditioner in a trade dress that is highly confusingly similar to the trade dress of Soft Sheen. Continued use by Revlon of the highly similar trade dress will destroy the exclusive franchise or source identity that the appearance and trade dress of Soft Sheen's Care Free Curl products have achieved in the minds of the consuming public and trade, resulting in loss of its goodwill and control over its reputation.

17. Given the irreparable nature of damages caused by trade dress infringement, Soft Sheen has no adequate remedy at law.

18. Revlon sells a full line of health and beauty goods. Soft Sheen does not market a full line of health goods, but rather limits its marketing activity to products designed specifically for the black ethnic market. The extent of the trademark owner's product line may be considered in assessing harm from infringement and unfair competition. Given this fact, and that Revlon can resort to its prior beige and maroon trade dress or its other Creme of Nature trade dresses, the harm to Revlon in issuing an injunction is outweighed by the harm to Soft Sheen in denying an injunction.

19. Because the public has an interest in protecting the rights of trademark and trade dress owners, the public interest will not be disserved by granting Soft Sheen immediate injunctive relief.

20. For the foregoing reasons, Soft Sheen is entitled to a preliminary injunction.

PRELIMINARY INJUNCTION ORDER

This cause coming on to be heard on plaintiff's motion for preliminary injunction, the court having reviewed the pleadings and briefs filed by the parties, having heard the testimony of the parties' witnesses and the arguments of counsel for the parties, having examined the documents and exhibits admitted into evidence, and having found in favor of the plaintiff, this court hereby enjoins defendants, their agents, servants, employees and attorneys and all persons in active concert and participation with them pending the final determination of this action, from:

1. Incorporating the trade dress used by plaintiff in its ethnic hair care product line into defendants' ethnic hair care product line or using such trade dress to sell, market, advertise or identify defendants' ethnic hair care products, or selling or attempting to sell merchandise containing such trade dress, or using such trade dress in any manner that imitates or is confusingly similar to plaintiff's trade dress or otherwise indicates or tends to represent that defendants are associated or affiliated with, authorized, sponsored or approved by plaintiff, or causing, directly or indirectly, such trade dress to be so used, sold, marketed or advertised.

2. Preparing and circulating, or causing, directly or indirectly, to be prepared or circulated, catalogs, letters, literature, advertisements and other graphic materials that exhibit defendants' hair care products incorporating plaintiff's trade dress or having a trade dress that indicates or tends to represent that defendants are in any manner associated or affiliated with, authorized, sponsored or approved by plaintiff.

3. Otherwise infringing or causing to be infringed plaintiff's trade dress.

For purposes of this order, plaintiff's trade dress is defined as those elements of its hair care product line that are arbitrary and non-functional, including the bright yellow background color of its packaging with bright red graphics located on the upper half of the package and particularly where the package is generally cylindrical with a red closure.

For purposes of this order, it is the finding of the court that the infringements of defendant which justify its issuance are found only in the packaging of defendants' shampoo and moisturizer.