**EMPI, INC., Plaintiff,**

v.

**IOMED, INC., Defendant.**

**Civil No. 3–95–843.**

United States District Court,
D. Minnesota,
Third Division.

Jan. 16, 1996.

David R. Fairbairn, Thomas J. Stueber and Timothy A. Czaja of Kinney & Lange, P.A., Minneapolis, MN, for plaintiff.

Brent P. Lorimer and John C. Stringham of Workman, Nydegger & Seeley, Salt Lake City, UT, and Lawrence M. Shapiro of Maslon, Edelman, Borman & Brand, Minneapolis, MN, for defendant.

## MEMORANDUM AND ORDER

DAVIS, District Judge.

This matter came before the Honorable Michael J. Davis on October 11, 1995 on plaintiff, Empi, Inc.'s ("plaintiff") motion for a preliminary injunction. For the reasons set forth below, plaintiff's motion is *granted.*

## FACTUAL BACKGROUND

Plaintiff and defendant, Iomed, Inc. ("defendant") are both in the business of manufacturing and selling iontophoresis products. Iontophoresis is a non-invasive method of administering pharmaceuticals through the skin by transferring or migrating drugs via an electrical current. The transfer is achieved by placing two electrodes connected to a DC power supply on the patient's skin. The first of the electrodes, referred to as the "drug delivery" electrode is coated with a pharmaceutical solution formulated to reduce inflammation. Once coated, the electrode is then placed upon the patient's skin. The second electrode is a "ground" or "dispersive" electrode which is used to complete the electrical circuit. The iontophoresis power device then generates an electric field which causes the charged drug molecules to travel from the delivery electrode into the tissue and blood stream of the patient. Thus, iontophoresis allows the patient to avoid the pain and anxiety associated with hypodermic needle injections.

Defendant alleges that it began selling iontophoresis products in the 1970's and was a "pioneer" in a market which was negligible before then. Plaintiff then entered the iontophoresis industry in approximately 1992 with the introduction of its Dupel© brand iontophoresis power device. Plaintiff alleges that it designed its electrodes to have a unique look with its square shape and snap connector in the middle. Thus, plaintiff purposefully configured its electrodes to look nothing like those of its competitors. Defendant counters, however, that it is common to use basic shapes such as circles, squares and rectangle with a foam type adhesive material and snap connector.

Plaintiff alleges that in approximately 1994 defendant began selling TransQ[2] electrodes with its Phoresor iontophoresis power device. The TransQ[2] is small and rectangular and incorporates a transparent shell and looks vastly different from plaintiff's device. The TransQ[2] is a modification of Iomed's original TransQ1 device which defendant sold for many years.

During the summer of 1995, plaintiff alleges that defendant "radically changed" the look of its electrodes and came out with a new iontophoresis electrode, referred to as the "TransQE" electrode which is similar in appearance to plaintiff's electrode. Plaintiff argues that defendant came out with this particular design for its iontophoresis device in order to participate in plaintiff's widespread success in its iontophoresis sales. Plaintiff alleges that defendant has infringed upon plaintiff's trade dress and has therefore moved the Court for a preliminary injunction pursuant to 15 U.S.C. § 1114 and rule 65 of the Federal Rules of Civil Procedure. For

the reasons set forth below, the Court finds that plaintiff is entitled to enjoin defendant from further sales of the TransQE electrodes.

## DISCUSSION

■ The Eighth Circuit has established the following analysis to be used in considering a preliminary injunction motion:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *accord Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1090 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). Whether a motion for preliminary injunction should be granted rests with the sound discretion of the Court. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 667 (8th Cir.1987). In weighing these factors, no single factor is dispositive; rather, all of the factors must be considered in determining whether on balance they tip toward granting injunctive relief. *Id.*

### Probability of Success on the Merits

■ To establish trade dress [1] infringement, a plaintiff must show that: (1) the trade dress is non-functional; (2) the trade dress is either inherently distinctive or has acquired secondary meaning; and (3) defendant's use of the same or similar feature (or combination of features) creates a likelihood of confusion in the consumer's mind as to the source of the product. *Stuart Hall Co., Inc. v. Ampad Corp.,* 51 F.3d 780, 783 (8th Cir. 1995) (citing *Prufrock Ltd., Inc. v. Lasater,* 781 F.2d 129, 132 (8th Cir.1986)). An analysis of the record demonstrates that plaintiff satisfies all three of these elements.

1. Trade dress is an unregistered trademark.

## 1. Non–Functionality of Plaintiff's Trade Dress

■ A design is "functional" if it performs some function other than identifying the source of the goods. As the Eighth Circuit has stated:

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits [sic] its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demand in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.

*Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 873 (8th Cir.1994); *Prufrock,* 781 F.2d at 133.

■ Plaintiff and defendant disagree as to the appropriate method for analyzing the functionality of a particular trade dress. Plaintiff asserts that the functionality of a trade dress must be viewed by examining the overall design of a product rather than its individual components. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113 (5th Cir.1991), *aff'd,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Defendant argues, however, that the law of the Eighth Circuit is that functionality is analyzed by examining the functionality of a trade dress' constituent parts. In support of this assertion, defendant relies upon the Eighth Circuit's holding in *Stuart Hall Co. v. Ampad Corp.* where the court stated that "a product's trade dress is not the entire product itself, but specific features of the product; we find no difficulty in looking at a specific feature of a product and determining whether and to what degree that feature is dictated by the nature of the product." 51 F.3d at 788.

Defendant mischaracterizes the court's holding in *Stuart Hall.* That statement refers to a prior test for the inherent distinctiveness component rather than the function-

ality component of the trade dress analysis. Nowhere in that opinion did the Eighth Circuit discount or undermine the premise that functionality is examined by looking at the total image of a product, the overall impression created, and not the individual features. *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990). In fact, the *Stuart Hall* court stated in its analysis of functionality that "Therefore, we remind the district court, if it reaches the issue of nonfunctionality on remand, that individual format and design elements of Stuart Hall's planner pages may be primarily nonfunctional, *even if* such elements as lines on which to write appointments throughout the day are not." 51 F.3d at 790 (emphasis added). Defendant's contention is therefore rejected and the Court will analyze the functionality component by examining the entire product and its overall impression.

■ Viewed in this light, the Court cannot discern any legitimate competitive need to sell an iontophoresis product with plaintiff's particular shape and design. The record reflects that a number of alternative, equally suitable designs exist to perform the tasks of plaintiff's product, which is a key factor demonstrating nonfunctionality. *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268 (10th Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988) (citing *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1341 (C.C.P.A. 1982)). In fact, defendant's former design and shape in the market was nothing like that of plaintiff's. With a number of actual electrode designs currently on the market, it is unnecessary for a competitor to copy plaintiff's trade dress in order to effectively compete. *Aromatique*, 28 F.3d at 873.

Defendant's argument that the snap connector, the foam adhesive, and the shape of the pad serve functional purposes is not dispositive. The fact that the shape of plaintiff's product or any other feature serves a utilitarian function does not necessarily undermine the product's legally recognizable trade dress. *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217 (8th Cir.1976), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Again, the inqui-

ry is whether the combination of features, the overall shape and design of plaintiff's product, is adopted for purposes of identification and individuality. In this case, the Court finds that plaintiff's shape and design, although they serve useful purposes, are primarily adopted to distinguish its product from those of its competitors.

2. Secondary Meaning

■ Secondary meaning is defined as an association in the minds of consumers between the mark and the origin or source of the product. *Id.* at 1219. Establishing secondary meaning requires the user to show that the mark or symbol has become so associated in the public mind through long and exclusive use that it serves to identify and distinguish it from the goods of others. *Id.* The ultimate inquiry is whether in the consumer's mind the mark denotes "a single thing from a single source." *Co–Rect Products v. Marvy! Advertising Photography*, 780 F.2d 1324 (8th Cir.1985) (citing *Security Center, Ltd. v. First National Security Centers*, 750 F.2d 1295, 1301 (5th Cir.1985)).

■ The factors which a court uses in assessing secondary meaning include: (1) whether actual consumers associate Empi's trade dress with its product; (2) the degree and manner of Empi's trade dress; and (3) whether Empi's trade dress has been exclusive. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 614 (9th Cir.1989). Expert surveys of consumers can provide the most persuasive evidence of secondary meaning. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir.1985). Additionally, proof of copying strongly supports an inference of secondary meaning. *Vision Sports, Inc.*, 888 F.2d at 614.

Plaintiff argues that an examination of these factors supports its allegation that Empi's trade dress has acquired secondary meaning. Plaintiff alleges that it has invested millions of dollars in advertising and promotional costs since 1992 to market its product. Plaintiff also relies upon its survey conducted by Martha E. Needham in which 85% of the physical therapists who were interviewed recognized Empi's iontophoresis electrodes as those of Empi. Additionally,

plaintiff points to the fact that Iomed deliberately copied plaintiff's trade dress in what plaintiff argues is an attempt to share in the lucrative revenues which plaintiff has been receiving.[2]

In refuting plaintiff's claims of secondary meaning, defendant first attacks the validity of the Needham survey, alleging that the survey was intentionally and overwhelmingly biased toward Empi users. Although the Court does not agree that the survey is "hopelessly biased", the Court does agree that the evidentiary value of therapists' responses is substantially reduced. The record reflects that only 30 therapists participated in the Needham survey almost all of whom had been using Empi products for at least one year. Additionally, defendant alleges that plaintiff itself selected the clinics which participated in the survey, a fact which plaintiff does not dispute. Therefore, the conclusion that 84% of the therapists recognized Empi's iontophoresis electrodes as being manufactured by Empi is hardly surprising. Given the parameters of the survey, the Court finds this statistic of little, if any, evidentiary value in establishing secondary meaning.

Nevertheless, an examination of the other factors establishes that plaintiff's product has established secondary meaning. The record reflects that Empi has expended millions of dollars since 1992 to advertise and promote its iontophoresis product to have a unique look amongst the other iontophoresis electrodes.

Also persuasive to the analysis of secondary meaning is defendant's intentional copying of plaintiff's product.[3] What the Court cannot understand is why defendant decided in the summer of 1995 to transform the appearance of its iontophoresis product to look almost identical to that of plaintiff's. An examination of the appearance of the TransQ[1] and TransQ[2] products versus the TransQE products reveals a dramatic change in every single characteristic of the Iomed product from the appearance of the box to the packaging of the electrode to the actual electrode itself. Even if the Court were to accept the patented hydrogel and silver/silver chloride technologies as the impetus for the complete change in the appearance of the electrode, that standing alone, is insufficient. What is inexplicable are the reasons why the actual electrode looks almost identical to that of plaintiff's and why there is no label on the adhesive backing of the label to indicate that it belongs to Iomed. Also unclear are the reasons for the switch from a white and blue color packaging to a clear packaging identical to that of plaintiff's and why Iomed's electrodes are packaged in a manner identical to Empi's.

Defendant argues that it has "conspicuously marked the accused goods with its own trademark" in order to attempt to distinguish his goods from those of plaintiff and, therefore, no inference of secondary meaning can be drawn. In support of this argument, defendant relies upon the Eighth Circuit's opinion in *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d at 871 where the Court stated, in pertinent part:

> The copying that was present here cannot support an inference of secondary meaning. There is no doubt that Gold Seal deliberately copied Aromatique's Spring and Christmas products. Gold Seal's products, however, were consistently and clearly labeled with Gold Seal's own trademarks, some of which are registered. Gold Seal's butterfly label is prominently featured on its packaging, as Aromatique's name and logo, the woodblock upper case A, are prominently featured on Aromatique's packaging. Gold Seal's conspicuous placement of its identifying marks must be seen as an attempt to distinguish its potpourri from Aromatique's. *See L.A. Gear, Inc. v. Thom Mc An Shoe Co.,* 988 F.2d 1117, 1134 (Fed.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) ... Because of Gold Seal's conspicuous use of its own trademarks, therefore, it was clearly erroneous to infer from Gold Seal's

---

**2.** For purposes of this motion, Iomed assumes without conceding that copying has occurred.

**3.** Defendant's "assumption" that it has copied plaintiff's product is much more than an assumption—it is a fact.

copying of Aromatique's product that the marks at issue here had acquired secondary meaning.

Defendant's analogy to the facts of *Aromatique* is misplaced. Unlike Gold Seal, Inc., where defendant clearly labeled the integral components of the actual product, defendant in the present action has failed to indicate anywhere either on its electrodes or their plastic backing that they belong to Iomed. Nor is there any label on the white plastic packaging containing defendant's drug delivery electrode that indicates the "Iomed" name. Were one to remove the electrodes from the clear cellophane, it would be very difficult for a user or purchaser to identify the electrodes as those of Iomed. As set forth in detail below, the Court finds that defendant's products are not clearly and conspicuously labeled and, therefore, rejects defendant's reliance upon the *Aromatique* rationale. Secondary meaning has been established.

### 3. Likelihood of Confusion

Likelihood of confusion is evaluated in the same manner in trade dress cases as it is in trademark cases. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 616 (9th Cir.1989). The test for trademark infringement is whether the allegedly infringing mark "is likely to cause confusion, or mistake, or to deceive" potential purchasers or consumers. 15 U.S.C. § 1114(1)(b). Generally, a likelihood of confusion has been established if an appreciable number of reasonable buyers are confused by the similar marks. *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419, 1427–28 (D.Minn.1989) (citing 2 McCarthy, *Trademarks and Unfair Competition 2d* § 23.1(B) (1984); *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir.1979)).

In evaluating the issue of likelihood of confusion, the Eighth Circuit has set forth a series of factors: (1) the strength of the infringed trade dress; (2) whether the trade dress examined as a whole are similar; (3) the degree to which the products compete with one another; (4) intent on the part of the alleged infringer to pass off its goods as the product of another; (5) evidence of actual confusion; and (6) whether the kind of product, its costs and conditions of purchase, allow the purchaser to eliminate the likelihood of confusion which would otherwise exist. *Id.* (citing *SquirtCo.*, 628 F.2d at 1091). The Court will analyze each of these factors in turn.

### a. Strength of the Infringed Trade Dress

The Court finds that plaintiff's trade dress is strong. The size and shape of the electrodes are presently similar to those of defendant, but prior to the summer of 1995, were unlike any of its competitors. Given plaintiff's extensive advertising over the course of the last three years, it is very likely that purchasers and/or users identify the electrodes at issue to be manufactured by plaintiff. Plaintiff's status as the iontophoresis electrode market leader and manufacturer of the most frequently used electrode in America bolsters this assertion.

As set forth above, plaintiff's assertion that 84% of the physical therapists recognized the Empi product is of little probative value. Even without this statistic, however, the Court finds that plaintiff's trade dress is strong.

### b. Similarity of Trade Dress

Similarity of appearance is determined by assessing the overall impression created by the trade dress as a whole rather than through a simple comparison of the individual features. *Aveda Corp.*, 706 F.Supp. at 1429 (citing *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 505 (5th Cir.1980)). The similarity between the products must be compared as the products are encountered in the marketplace, taking into account the circumstances surrounding the purchase of the goods. *Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d 190, 192 (8th Cir.1982).

Defendant first argues that plaintiff's analysis of the likelihood of confusion improperly focuses on post-sale rather than pre-sale conditions. In support of this argument, defendant relies upon *Munsingwear Inc. v. Jockey Int'l, Inc.*, 31 U.S.P.Q.2d 1146, 1994 WL 422280 (D.Minn.1994), *aff'd*, 39 F.3d

1184 (8th Cir.1994) where the Eighth Circuit affirmed the trial court's opinion that the proper time to evaluate likelihood of confusion is pre-sale rather than post sale. But defendant fails to point out that the trial court explicitly premised its ruling for a pre-sale analysis based upon the fact that "[A]ny relevant consumer confusion will occur prior to sale, if at all ... The inherently concealed nature of worn underwear diminishes the concern for post-sale confusion ..." *Id.* at 1150. Furthermore, the *Munsingwear* Court held that "The presence of permanent labeling has been generally recognized to make post-sale customer confusion unlikely." *Id.*

The Court rejects defendant's reliance upon this decision. Unlike the present action, this is not a case where defendant's products are inherently concealed. Nor do they contain any permanent label which may help to alleviate any confusion between the two products. The trademarks must be assessed for confusing similarity in a post-sale situation where many of the identifying factors will not be present. *Lois Sportswear, U.S.A., Inc., v. Levi Strauss & Co.,* 631 F.Supp. 735 (S.D.N.Y.1985), *aff'd,* 799 F.2d 867 (1986). Therefore, the Court will apply a post-sale analysis in determining the likelihood of confusion between plaintiff's and defendant's products.

As set forth above, the Court finds that the products at issue are strikingly similar. Defendant's argument that its labeling on the box and the cellophane packaging preclude a finding of likelihood of confusion is without merit. The fact remains that once the electrodes are removed from the similar cellophane packaging, there is no indication whatsoever as to which products belong to Iomed. Neither the adhesive backing attached to the electrodes nor the white package containing the electrode contain any Iomed label; thus, unlike the *Munsingwear* case, this is not a situation where the product contains a "permanent" label which may dispel any likelihood of confusion as to the owner of the electrode. The labeling itself on the clear cellophane packaging is very similar with a black font upon a clear white label. Assuming the products were not removed from the cellophane package, one would still have to look fairly closely to determine which products belong to plaintiff and which belong to defendant.

The strongest similarity between the two products is, of course, the identical appearance of the electrodes themselves. It would be virtually impossible for a consumer looking at the electrodes to distinguish those of plaintiff's from those of defendant's. Defendant's argument regarding the hydration system on the drug delivery electrode is not a sufficient basis for eliminating the likelihood of confusion between the two products. The shape, color, and dimensions of the drug delivery electrodes of Iomed and Empi are almost exactly the same. Moreover, there is no perceivable difference between the shape, color, size, dimensions and overall appearance of the parties' ground electrode. Even the reverse side is an identical dark brown color square shape with a lighter brown border.

#### c. Degree of Competition

In the present action, both parties sell iontophoresis devices and electrodes to physical therapy clinics and are, therefore, direct competitors. Direct competition requires a lesser degree of showing to establish likelihood of confusion than products not in direct competition with one another. *Squirt-Co.,* 628 F.2d at 1091.

#### d. Intent to Pass Off Goods

An inference of intent arises where a party, with knowledge of a competitor's trade dress, chooses a similar dress from an infinite number of possibilities. *Aveda,* 706 F.Supp. at 1429. One who does copy a trade dress of another, previously established trade dress is presumed to have deceived the public. *Beer Nuts,* 711 F.2d at 941. Thus, any doubts as to whether the confusion or deception is mistaken is to be resolved against the newer product. *Soft Sheen Products, Inc. v. Revlon, Inc.,* 675 F.Supp. 408, 416 (N.D.Ill. 1987).

In the present action, the Court finds that a strong inference exists that defendant intended to pass off its goods as those of Empi's. The record reflects that defendant

has been selling iontophoresis products for nearly twenty years, which is longer than plaintiff. Yet in the summer of 1995, defendant revamped the look of its product and has not explained to the Court the reasons for these changes.

### e. Conditions of Purchase

Defendant argues that plaintiff's analysis should be rejected because it ignores conditions at the time of sale. Defendant asserts that Empi fails to set forth any explanation of the way in which TransQE electrodes are sold or the considerations which go into purchasing decision. Defendant argues that the Iomed sales presentation is an important factor in distinguishing its product from that of Empi's. According to defendant, the Iomed dealers remove the release liner and show the therapist the TransQE drug reservoir on the back of the electrode. They then explain and demonstrate Iomed's hydrogel technology and also discuss Iomed's patented silver/silver chloride technology. Defendant thus concludes that these factors form a sufficient basis for distinguishing its products from those of plaintiff.

■ Differing methods of sales presentations reduce to some degree the potential for confusion inherent in the close similarity between two marks. *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d at 1134. They are not, however, conclusive as to the issue of likelihood of confusion. *TAC Technical Instrument Corp. v. Fischer & Porter Co.*, 433 F.2d 827, 829 (C.C.P.A.1970).

Although the Iomed dealers may attempt to differentiate their product on the aforementioned bases, the fact remains that the products themselves appear almost identical. According to plaintiff, when electrodes are presented to a physical therapist, they are not shown with the box which defendant claims is a distinguishing feature. Rather, the electrodes are shown in the clear cellophane pouch which bears a striking resemblance to that of plaintiff's. Thus, although the sales presentation of Iomed may help to differentiate the products, the Court does not find that this factor, standing alone, eliminates any likelihood of confusion between the two products.

### f. Actual Confusion

■ Actual confusion is not essential to a finding of trade dress infringement, but it does provide positive evidence of a likelihood of confusion. *SquirtCo.*, 628 F.2d at 1091. Plaintiff proffers its survey conducted by Martha Needham as evidence of actual confusion in this case. Plaintiff points to the fact that 24 of the 31 or 77.4% of the physical therapists surveyed confusingly believed that the TransQE electrode was manufactured by Empi. Because percentages above 50% are strong evidence of a likelihood of confusion, *Sears Roebuck and Co. v. Johnson*, 219 F.2d 590 (3rd Cir.1955), plaintiff argues that defendant's electrodes caused confusion in this case.

■ Defendant counters that this statistic is invalid because of the method in which it was conducted. Among other things, defendant argues that Ms. Needham attached electrodes to placards and asked if the physical therapists recognized the top side of the electrodes. Absent from the questions were any reference to or demonstration of the labeling and other indicia of origin which accompanies the TransQE electrode. Plaintiff points to no authority supporting its method of conducting the survey nor does it refute these contentions.

Nevertheless, as set forth above and in the Court's Order regarding the Motion to Strike the Needham Survey, the Court does not find that any defects in the survey require it to be stricken from the record. The Court finds that the 77.4% statistic is a bit misleading because of the manner in which it was conducted. According to defendant, the physical therapists were not given an opportunity to examine the clear cellophane packaging or the adhesive backing of the ground or drug delivery electrode.

But this certainly does not mean that the Court should entirely disregard the results of the survey. It was Iomed alone that opted to dramatically alter the appearance of its electrode to look confusingly similar to Empi's. It cannot now come forth and argue that the Court cannot take notice of the fact that an overwhelming majority of trained

physical therapists could not decipher between the two parties' products.

Nor is it even clear that the labeling on the electrode and the cellophane packaging would have eliminated any prior confusion. Defendant has proffered no empirical evidence to support this assertion. Additionally, as explained above, the Iomed cellophane packaging itself is identical to that of Empi's. The label on defendant's package is also similar with black lettering on a white background. And finally, the adhesive backing to which the electrodes themselves are attached are blank, providing no evidence whatsoever that the products belong to Iomed. Although Empi's adhesive backing contains its name, it is very likely that a purchaser could also mistake Iomed's blank electrodes to be those of Empi's given the almost identical appearance of the electrodes themselves. Given this analysis, the Court will give substantial weight to the Needham statistic demonstrating that a significant number of physical therapists who were previously familiar with the Empi products mistakenly believed Iomed's electrodes to be those of Empi.

Additionally, the Court finds persuasive to the affidavit of Monte R. Koenig, Territory Manager for iontophoresis products manufactured by Empi. According to the affidavit, Monte Koenig was performing an inventory check along with a physical therapist at a clinic in Wisconsin to determine the iontophoresis electrode supply level. During the inventory check, Koenig noticed a package of TransQE electrodes leaning against an Empi Dupel shipping box. When Koenig asked the physical therapist about the origin of the TransQE electrodes, the physical therapist appeared to be very confused. She said that she thought the electrodes were the property of Empi rather than Iomed.

The Court finds that this incident, along with the Needham survey, provide more than sufficient evidence of actual confusion between plaintiff's and defendant's products. Additionally, the Court finds that an analysis of the foregoing factors supports a finding that a very high likelihood of confusion exists in this case and, given a positive showing of non-functionality and secondary meaning, plaintiff will likely succeed on the merits.

### Irreparable Harm

Because the Court has found that a likelihood of confusion and success on the merits exist, it may presume an irreparable injury. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.,* 815 F.2d 500, 505 (8th Cir.1987). Plaintiff has also demonstrated that it can lose control over the reputation and goodwill of its products if defendant is not enjoined from continuing to manufacture a confusingly similar product.

### Balance of Hardships

The Court also finds that the balance of hardships tips in favor of plaintiff. The record reflects that plaintiff has invested considerable time and millions of dollars promoting its product. Conversely, defendant did not even begin to market its TransQE electrode until mid–1995.

It is certainly true, as Iomed argues, that precluding them from continuing to market their product will cause financial hardship from their lost inventory; however, the fact remains that plaintiff stands to lose not only its lost inventory, but also significant revenue from lost sales, market share, reputation and goodwill if defendant continues to market its product. Additionally, defendant was for years marketing the TransQ1 and TransQ$^2$ electrodes which are very different from the TransQE electrodes. Granting plaintiff a preliminary injunction in the present action would not prevent defendant from either resuming use of its prior trade dress or devising a trade dress which does not infringe upon the appearance of its competitors.

Defendant also argues that "There is no evidence that Empi spent *any* time or money developing the appearance of its electrodes" because the millions spent on advertising is not related to the development or advertising of its trade dress. This argument is without merit. Implicit in the advertising and promotion of its product and its rise as the market leader in the sale of iontophoresis products is the particular appearance of Empi's electrodes. Plaintiff does not need to establish any nexus between its promotion and advertising and the appearance of its trade dress.

*Public Interest*

■ The final factor to be considered in determining whether to grant a preliminary injunction is an examination of the public interest involved. In trademark infringement actions, this factor involves balancing the interests in protecting the public from confusion or deception against the interest in a competitive market. *Aveda*, 706 F.Supp. at 1431–32 (citing 2 McCarthy, Trademarks and Unfair Competition 2d § 30:21). In the present action, the Court finds that protecting the public from confusingly similar products outweighs the interests in a competitive market and that the public interest will be served by granting the preliminary injunction.

■ Plaintiff and defendant also set forth a series of arguments regarding the possibility of injury to patients who use Empi products with those of Iomed. Plaintiff has not provided sufficient authority to support its argument that a significant risk of burning exists when the electrodes are interchanged. Nor has plaintiff adequately supported its assertion that the area within the "dark ring" passes enough electrical current to constitute a significant risk or likelihood of burning to the patient.

Moreover, defendant has proffered convincing empirical evidence [4] from an internal study which analyzed the uniformity of drug distribution, the duration of anaesthesia administered, and the degree of the sensation of treatment experienced by the patient during administration. The study found that no significant risk occurs when using IOMED TransQE electrodes with Empi Dupel power supplies and that the TransQE electrode may appropriately be used with Empi Dupel power supplies. Given this study and plaintiff's lack of significant evidence to the contrary, the Court finds that no public safety issue exists regarding injury to patients. Nevertheless, given the fact that the public interest is served by avoiding the strong likelihood of confusion between the two products, the Court finds that the final prong of the preliminary injunction analysis is satisfied.

4. As set forth in the Court's prior Order, defendant was given leave to file a reply brief regard-

*ORDER*

Based upon the foregoing files, records and proceedings, it is HEREBY ORDERED that plaintiff's motion for a preliminary injunction is *granted*. Plaintiff is required to post security in the amount of $1,500,000.

ing the subject of public interest.