**DORR–OLIVER INCORPORATED, Plaintiff,**

v.

**FLUID–QUIP, INC., Andrew Franko, and Pic Tek, Inc., Defendants.**

No. 93 C 0842.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 17, 1995.

William Terry Rifkin, Mary Spaulding Burns, Rockey, Rifkin and Ryther, Chicago, IL, John P. Luther, Andrew L. Tiajoloff, Alfred H. Hemingway, Jr., Edward P. Kelly, John E. Lynch, Felfe & Lynch, New York City, for Dorr–Oliver Inc.

Thomas W. Flynn, Thomas & Buckley, Chicago, IL, Bruce E. Peacock, Thomas W. Flynn, Matthew R. Jenkins, Biebel & French, Dayton, OH, Patricia Susan Smart, John Bostjancich, Smart & Bostjancich, Chicago, IL, for Fluid–Quip Inc., Andrew Franko, Pic Tek Inc.

## MEMORANDUM OPINION AND ORDER

### I. *Introduction* [1]

GETTLEMAN, District Judge.

This is a case about corn, clams, copying and confusion. The story begins decades ago, when plaintiff Dorr–Oliver Incorporated ("Dorr–Oliver") [2] invented a new way to process corn using centrifugal force. Prior to these inventions, the corn wet milling industry separated the germ, fiber, starch and gluten (protein) from corn kernels through a time-consuming settling process.

In the 1950s Dorr–Oliver introduced a number of new devices, including the hydrocyclone starch washer, into which the "slurry" (the mixture of water and processed corn) was passed to separate the starch from the gluten in the final stages of the separation process. This "starch washing" procedure employed great numbers of small hydrocyclones arranged inside a series of machines known as "clamshells," the machines at issue in this litigation. The slurry is injected into the machine at high pressure, and passes through as many as 480 stationary hydrocyclones known as "cyclonettes." The centrifugal force thus created inside the cyclonettes separates the starch and the gluten, the former directed to an "underflow" chamber and the latter to an "overflow" chamber. The separated starch and gluten are then sent to the next stage in the process.

Because Dorr–Oliver is claiming that defendants infringed an alleged trademark right to the name "clamshell" and to Dorr–Oliver's alleged trade dress in the outer design of the "clamshell," it is necessary to understand the appearance of the machine. For those readers who are not using computers to access this opinion, a picture of a clamshell taken from Defendants' Exhibit 339 and 340 (drawings of defendant Fluid–Quip, Inc.'s machine) is attached as Appendix A. For the rest of the readers, the court will attempt to describe the device.

The clamshell starch washer comes in two sizes, the smaller holding 280 cyclonettes and the larger holding 480. Since the larger unit was displayed by both Dorr–Oliver and defendants at the trial, this description will relate to that size. The machine is made of stainless steel, is generally round in shape, and is approximately forty inches in diameter. To the court's eye, it more closely resembles a bagel or an inflated inner tube than it does a clam in outward appearance. Each side is identical and bolted to a center core. If one pictures a forty inch metallic bagel sliced in half, each half attached to a cylindrical core of approximately the same diameter, with a spoked or ribbed hatch in the middle, all supported by two large feet, with various pipe fittings sticking out the sides, one could picture this machine.

The clamshell starch washer is one of several designs manufactured by Dorr–Oliver under the registered trademark "DorrClone." It is sometimes referred to by Dorr–Oliver in its commercial communications as a

---

1. This section will include the basic facts necessary for an understanding of the case. Additional details will be discussed in later sections as those facts relate to specific claims and defenses.

2. Dorr–Oliver is a Delaware corporation with its principal place of business in Connecticut.

"DorrClone Type C" or "DorrClone Clamshell starch washing system design." The other types of DorrClone starch washers, including the "RC" and "TM" models,[3] do not look anything like the clamshell, although they perform the same function, using the same general technology.

The word "clamshell" was and is not registered by Dorr–Oliver or anyone else as a trademark for that particular type of starch washing machine. There is no evidence in the record indicating how the name "clamshell" came to be used to describe the Dorr–Oliver machine, although the court infers that, despite the court's observation that the machine looks more like a bagel than a clam, at least some people in the corn wet milling industry felt otherwise.

For a number of years, even after its patents had expired on its clamshell starch washer, Dorr–Oliver was the only manufacturer and supplier of this device. In the United States, there are only twelve customers with twenty-seven corn wet milling plants in this market. Each of these customers owns and uses Dorr–Oliver clamshell starch washers, more than 600 of which had been sold prior to 1991. The nature of these machines, which have no moving parts, is such that they appear to last almost forever; it is uncontested that all of the machines sold by Dorr–Oliver, even those manufactured as early as the 1950s, are still in use.

Defendant Fluid–Quip, Inc. ("Fluid–Quip"), an Ohio corporation with its principal place of business in Springfield, Ohio, was founded in 1987 and originally manufactured equipment for the paper and pulp industry. In 1991, Fluid–Quip entered the corn wet milling market, first with replacement parts and later with its own clamshell starch washer. Fluid–Quip's clamshell was admittedly copied from Dorr–Oliver's. Fluid–Quip's president and part owner, defendant Andrew Franko ("Franko"),[4] admits that he and employees of one of Fluid–Quip's manufacturer's represen-

tatives, defendant Pic Tek, Inc. ("Pic Tek"),[5] measured Dorr–Oliver clamshells and conformed Fluid–Quip's model to the exact dimensions of Dorr–Oliver's. Fluid–Quip says it did so as a response to requests by customers that Fluid–Quip build a clamshell that was fully interchangeable with Dorr–Oliver's. In fact, one of those customers, Cargill, delivered the smaller model of a Dorr–Oliver clamshell to Fluid–Quip to assist with the measurements.

According to Fluid–Quip, these customers believed that they were being overcharged by Dorr–Oliver, which exercised *de facto* monopoly power and charged up to $40,000 for a clamshell. (Fluid–Quip's price for the identical machine turned out to be between $20,000 and $25,000.) From a maintenance standpoint, while the outer housing of the clamshells will last indefinitely and rarely need repair, the inner cyclonettes need to be replaced every two to three years. The cyclonettes also periodically get plugged up or possibly broken and need to be replaced.

Because clamshells were generally arranged in series of twelve, when they are disassembled for maintenance and repair the customer's practice is to do so with a number of units at the same time. Parts from one unit (e.g., the large outer housing or the hatch cover) might well be reattached to another unit. Thus, the parts from a given unit must be interchangeable with the parts of every other.

Although to the untrained eye Fluid–Quip's clamshell looks identical to Dorr–Oliver's, Mr. Franko pointed out a number of subtle differences which he believes are "improvements" over the Dorr–Oliver model. For example: Fluid–Quip's clamshell uses studs rather than bolts to attach the outer housing to the core; Fluid–Quip's clamshell attaches its supporting feet by flat footpads affixed to the core, rather than by bolting the feet to the core itself; Fluid–Quip's feet are somewhat different and heavier than those of

---

**3.** The RC model, referred to by some as a "rocket ship," is cylindrical in shape and resembles a tall, vertical oxygen tank. The TM model is also cylindrical but is horizontal and supported by a stand.

**4.** Franko is a citizen and resident of Ohio.

**5.** At the end of the trial, Dorr–Oliver and defendants agreed to dismiss Pic Tek as a defendant in this case. Fluid–Quip and Franko will be referred to collectively as "defendants."

the Dorr–Oliver unit; the drain plugs on Fluid–Quip's machine are more numerous and placed in different positions than Dorr–Oliver's; the lifting rings on Fluid–Quip's model were larger than Dorr–Oliver's; and Fluid–Quip's name is cast onto each removable part of its clamshell, while Dorr–Oliver's name appears on only several of the larger parts. (Both Fluid–Quip and Dorr–Oliver affix nameplates to their machines which bear their respective corporate names. Dorr–Oliver's nameplate also bears its registered trademark "DorrClone.")[6]

The interior of Fluid–Quip's clamshell is identical to Dorr–Oliver's, consisting of two large round center plates with holes for each of the cyclonettes (480 or 280, depending on the model), spacing pins to separate the two center plates to create the center chamber into which the slurry is pumped, and the interior of the outer housing that creates the overflow and underflow chambers for the separated gluten and starch, respectively. (See Appendix B hereto, Def.Ex. 340.) Also, the center bolt that fastens the outer housing through the center hatches on each side of the machine is identical in both models, and the ribbed center hatch itself is identical.

Prior to developing Fluid–Quip's clamshell starch washer, its president, Mr. Franko, consulted his corporate attorney and an intellectual property lawyer. Franko had a few short conversations with his corporate attorney in which he asked the lawyer if it would be proper to manufacture a piece of equipment that would have interchangeable parts with the Dorr Oliver clamshells so that it could replace the existing units. The attorney, who had never seen the product, asked if the item was patented. Franko briefly explained what part a clamshell played in the corn refinery business. After being told that Franko did not think there was an active patent, the corporate attorney briefly opined that his client could probably produce its own clamshell so long as he was not creating confusion in the marketplace, and advised Mr. Franko to consult counsel more experienced with intellectual property issues.

Following these conversations, Franko met with his intellectual property attorney on a different matter. Franko briefly discussed producing a cyclone separator that was similar to the one made by Dorr–Oliver, how long the Dorr–Oliver product had been on the market, the patent numbers on the name plate and the terms DorrClone and cyclonettes. The lawyer did not have a picture of the product, and Franko described the unit as a cluster of cyclonettes within two mating castings that are coupled together, with the cyclonettes extended parallel to the axis of the unit.

In his deposition,[7] the lawyer explained his customary procedure for determining whether a client would be infringing a competitor's trade dress rights was to compare the products. Franko never asked his attorney to investigate any potential trade dress or trademark infringements. Based on the above description and Franko's indication that he intended to make a cyclone separator that looked "similar" to the Dorr–Oliver cyclone separator, that lawyer also told Franko he could lawfully produce a clamshell.

Dorr–Oliver introduced into evidence a number of photographs of actual starch washing sections of its customers' corn wet milling plants. A typical photo shows several parallel lines of clamshells (as many as 36 in total) connected by various piping. The overall appearance is of a uniform, orderly grouping of these machines. Some of the photos are of groupings that include both Dorr–Oliver's and Fluid–Quip's clamshells. Mr. Franko was able to identify Fluid–Quip's units in these photos by the footplate attached to the center core of those units, since Dorr–Oliver's have no footplates.

Fluid–Quip achieved almost instant success in selling its clamshell. Although it was unsuccessful in one of its first attempts, losing a bid in 1991 for five clamshells for Cargill to a

---

**6.** Certain other "differences" pointed out by Mr. Franko, such as threaded bosses for the lifting rings, turned out to be no different after all, when photos of the Dorr–Oliver units in use were introduced into evidence.

**7.** The parties agreed to submit the deposition transcripts of Franko's corporate and intellectual property attorneys in place of requiring their testimony at trial.

Brazilian company called Codicil,[8] it soon succeeded in selling thirty-six clamshells to Archer Daniels Midland ("ADM"). To date, Fluid–Quip has sold eighty-one clamshells, all to customers who own and operate Dorr–Oliver clamshells as well.

Dorr–Oliver claims that, (a) by referring to the machine as a "clamshell" and (b) by "slavishly copying" Dorr–Oliver's outer design, Fluid–Quip and Franko violated the Lanham Act (15 U.S.C. § 1051, *et seq.*), Illinois common law of unfair competition, the Illinois Counterfeit Trademark Act (765 ILCS 1040 *et seq.*), the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 et seq.) and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.).[9] Because the court has previously found, and the parties have since stipulated, that there was no actual confusion at the point of sale (more about this below), Dorr–Oliver cannot seek damages based on its own lost profits. Thus, Dorr–Oliver seeks an award of Fluid–Quip's profits under 15 U.S.C. § 1117(a), a trebling of damages under the Illinois Counterfeit Trademark Act, attorneys' fees, costs, prejudgment interest and injunctive relief.

For the reasons discussed below, based on the evidence presented at trial to the court sitting without a jury, the court finds that Dorr–Oliver has no trademark right to the name "clamshell." The court finds, however, that Dorr–Oliver does have a protectable trade dress right to the design of the outer housing of its clamshell starch washer, and that defendants infringed that right. The court does not find that this is an "exceptional" case of trade dress infringement or that Fluid–Quip's or Franko's conduct was malicious, fraudulent, deliberate, willful or in bad faith, as those terms are used in the context of trademark law. These basic findings compel a judgment in favor of Dorr–Oliver against defendants for trade dress infringement under the Lanham Act, Illinois common law, the Illinois Uniform Consumer Fraud and Deceptive Business Practices Act and the Illinois Deceptive Trade Practices Act, but not under the Illinois Counterfeit Trademark Act. Accordingly, Dorr–Oliver is entitled to an award of damages and injunctive relief, as more fully discussed below.

## II. *Legal Standards*

■ Expanding on patent and copyright protection, the Lanham Act provides plaintiffs protection from the deceptive and misleading use of their trademarks and their products' trade dress. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). In *Two Pesos*, the Supreme Court resolved conflicting lower court opinions acknowledging that parties seeking relief for alleged trade dress infringement are not required to have registered the product with the United States Patent and Trademark Office to bring an action under the Lanham Act. *Id.* at ——, 112 S.Ct. at 2757.

■ The Seventh Circuit defines "trade dress" as "the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Computer Care v. Service Systems Enterprises, Inc.* 982 F.2d 1063, 1067 (7th Cir.1992). To prove trade dress infringement, Dorr–Oliver must establish that: (1) its trade dress is "inherently distinctive" *or* has acquired "secondary meaning"; and, (2) the similarity of defendant's trade dress to Dorr–Oliver's product creates a "likelihood of confusion" on the part of consumers. *Two Pesos*, 505 U.S. at ——, 112 S.Ct. at 2758.

■ The Seventh Circuit adds a third element to the equation: that Dorr–Oliver's trade dress is "non-functional." *Computer Care*, 982 at 1068. This added element is actually an affirmative defense on which Fluid–Quip bears the burden of proof. *Id.*

---

8. Codicil is a Brazilian company that makes clamshells which, according to testimony from Cargill personnel, were substantially similar in appearance to those of Fluid–Quip and Dorr–Oliver.

9. The court has jurisdiction over the subject matter and the parties pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338(a) and 1332(a). Venue is proper under 28 U.S.C. §§ 1391 and 1392.

### III. *The Clamshell "Trademark"*

■ Dorr–Oliver claims that it has a common law trademark right in the name "clamshell" as it applies to its Type C starch washer. According to Dorr–Oliver, the fact that for decades the term applied only to Dorr–Oliver's machine (Dorr–Oliver alone made a clamshell starch washer until the early 1990s) compels a finding that the term is suggestive rather than generic or descriptive, and that the term has acquired a secondary meaning. Dorr–Oliver correctly points out (by referring to a real clam shell, Plaintiff's Exhibit 439) that the clamshell starch washer neither looks precisely like a clam nor does it operate like the two halves of a clam (closing together on a central axis like the shovel referred to in a dictionary definition cited by defendants).

Try as it might, Dorr–Oliver cannot overcome common sense or the evidence. As to the former, it has been earlier noted that while the court might liken the shape of the machine in question to a bagel, clams like beauty are apparently in the eye of the beholder. Although a clam is typically not perfectly round and opens and closes in a clam-like manner, the application of the name clamshell to this equipment seems perfectly natural. When one observes row upon row of these machines in a starch washing plant, it is not at all difficult to picture rows of clams arising uniformly from the ocean floor. That this image appeared to an early observer of Dorr–Oliver's starch washers is most likely.

The evidence presented at trial drives home the court's conclusion that the term clamshell is merely descriptive or generic. First, there is no evidence that Dorr–Oliver ever coined the term clamshell to describe its product. Nor did Dorr–Oliver ever seek to register the mark or claim any proprietary right to it in its commercial literature, its invoices, or on the name plates attached to each machine. Indeed, the name plates indicate that DorrClone is a registered trademark, but do not include the term clamshell. Dorr–Oliver's sales brochures also mention that DorrClone is a registered trademark, but make no claim as to the term clamshell. Moreover, when Dorr–Oliver's attorneys first wrote to Fluid–Quip in the summer of 1992, they claimed (apparently incorrectly) only that Fluid–Quip might be infringing some of Dorr–Oliver's expired patents; no mention was made of possible trademark infringement.

In addition, the evidence discloses without doubt that prior to this litigation everyone, Dorr–Oliver included, used the term clamshell more to describe the type of machine than as a proprietary term. Although Dorr–Oliver's brochures capitalize the "c" in clamshell or put the term inside quotation marks, there is no hint that Dorr–Oliver claims exclusive use.

More importantly, Dorr–Oliver's own customers used the term generically. For example, ADM's purchasing officer told Dorr–Oliver that it had "better get its prices down" or ADM would "buy somebody else's clamshells"—clearly indicating that he regarded the term as descriptive of the type rather than the manufacturer of the machine. This same witness also testified that clamshell means a piece of equipment used for washing protein out of starch, regardless of its manufacturer. As the customer explained, "[they] wanted the clamshell, Dorr–Oliver or Fluid–Quip whichever the case might be and Fluid–Quip had a better price." (Kampfe Dep. 4/6 p. 21)

Similarly, Cargill's purchasing officer testified that the term "clamshell" is used "universally," regardless of who made the unit. Unsure of where the terminology came from originally, it was "corn milling jargon that was in place when [he] entered the industry" and [he] simply "picked up" on the word. (Johnson Dep. p. 31–32.) The term was used in reference to Dorr–Oliver's, Fluid–Quip's and Codicil's machines.

Finally, there is no evidence that Fluid–Quip adopted the term clamshell to compete unfairly with Dorr–Oliver. The unrefuted testimony of Mr. Franko, whom the court finds to be a credible witness, is that people in the corn wet milling industry asked him to make a clamshell to compete with Dorr–Oliver, using the term to describe the type of machine. The terminology was and is part of the marketplace; members of the industry

refer to the clamshell as one might refer to a roadster or a convertible automobile, as descriptive of a type of vehicle rather than its manufacturer.

## IV. *Trade Dress*

As discussed in Section II above, to prevail on its trade dress infringement claim Dorr–Oliver must prove: (a) that the overall image of its clamshell's trade dress is "inherently distinctive" *or* has acquired secondary meaning; and (b) that the similarity of Fluid–Quip's trade dress to that of Dorr–Oliver creates a "likelihood of confusion" on the part of consumers as to source. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615, rehearing denied, —— U.S. ——, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992); *Health o Meter, Inc. v. Terraillon Corp.*, 873 F.Supp. 1160, 34 U.S.P.Q.2d 1369 (N.D.Ill.1995).

No one can seriously argue that Fluid–Quip's clamshell is not, for all practical purposes, identical in appearance to Dorr–Oliver's. As mentioned previously, Fluid–Quip admits that it copied Dorr–Oliver's machine for the avowed purpose of meeting its customers' requests that its equipment be completely interchangeable with Dorr–Oliver's. The issue to be decided, therefore, is whether Dorr–Oliver acquired trade dress rights to its design, and whether there is a likelihood of confusion. As discussed below, the court finds that Dorr–Oliver has in fact acquired trade dress rights because its clamshell design is both inherently distinctive and has acquired secondary meaning, and that there is a likelihood of confusion.

### A. *Inherently Distinctive*

In *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1069 (7th Cir.1992), the Seventh Circuit, relying on *Two Pesos*, reaffirmed that a trade dress is inherently distinctive, and therefore protectable without proof of secondary meaning, if it is "sufficiently distinctive to allow con-

sumers to identify the product from the trade dress."[10] Fluid–Quip's principal argument with respect to the issue of whether Dorr–Oliver's clamshell design is inherently distinctive is that the design is functional, an argument for which Fluid–Quip bears the burden of proof. *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 20 (7th Cir.1992). Only if Fluid–Quip proved a *prima facie* case of functionality would Dorr–Oliver be put to the burden of proving non-functionality.

Fluid–Quip cannot meet its threshold burden in this case. Although, to be sure, the clamshell design is efficient and, like most factory machines, functional in the sense that it performs its task with few decorative features, there can be no question that the clamshell is "sufficiently distinctive to allow consumers to identify the product from its trade dress." Perhaps this is best demonstrated by the fact that hydrocyclone starch washing equipment comes in several different shapes, and this has been the case for many years. The RC and TM models discussed in Section I above perform the same function as the clamshell using the exact same technology, but look nothing at all like a clamshell.

From the testimony of the expert and non-expert witnesses at trial, it is clear to the court that the key to manufacturing a successful hydrocyclone starch washer is in the internal configuration of the cyclonettes. From the evidence presented, it appears that these arrangements are always circular, although they can be either vertical or horizontal. The machines must be designed to allow easy disassembly for maintenance and cleaning purposes. In the RC model, the cylinders containing the cyclonettes are stacked one upon another in a vertical housing known as a "rocket ship." In the TM model, the cyclonettes are arranged in a horizontal plane. It is obvious to the court that the designers of the clamshell came up with a

**10.** This court agrees with Judge Holderman's conclusion in *Health o Meter* that the footnote dicta contained in *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 636 (7th Cir.1993), that "a product's shape is never inherently distinctive," could not have been intended by the court to have precedential impact. To hold otherwise would contra-

dict the Supreme Court's holding in *Two Pesos* that "withholding protection [of inherently distinctive trade dress] until secondary meaning has been established would be contrary to the goals of the Lanham Act." 505 U.S. at ——, 112 S.Ct. at 2761.

unique shape that identifies their product from all others.

Finally, it is uncontested that prior to Fluid–Quip's copying Dorr–Oliver's machine, everyone in the industry identified the clamshell shape with the Dorr–Oliver unit. Dr. Bates, former vice president of American Maize [11] and Dorr–Oliver's corn wet milling expert, testified that "the main thing that jumps out at you" when you see a Dorr–Oliver clamshell is an "inner-tube type" shape which makes the unit a Dorr–Oliver clamshell.

After weighing all of the evidence presented, the court therefore concludes that the Dorr–Oliver clamshell design is inherently distinctive.

### B. Secondary Meaning

■ Some of the evidence that has convinced the court that Dorr–Oliver's clamshell design is inherently distinctive also goes to prove that the design had acquired secondary meaning. The Seventh Circuit has held that the factors that may be used to determine secondary meaning include: (1) direct testimony of consumers; (2) exclusivity; (3) length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1267 (7th Cir.1989). The court finds that Dorr–Oliver has met its burden of establishing that its clamshell design had secondary meaning prior to the date on which Fluid–Quip began marketing its clamshell.

As mentioned above, the customers whose testimony was offered have clearly stated that they identified the clamshell design with Dorr–Oliver prior to Fluid–Quip's entry into the market. It is uncontested that Dorr–Oliver was the exclusive manufacturer of this machine for decades prior to Fluid–Quip's entry, and had marketed the machine extensively in the wet corn milling industry. Dorr–Oliver established its place in this market by selling its clamshell units to literally

every customer in the industry. Indeed, Dorr–Oliver revolutionized the entire industry with the introduction of its centrifugal hydrocyclone machines, including the clamshell. Finally, as mentioned above, it is uncontested that Fluid–Quip intentionally copied Dorr–Oliver's machine, thinking that it had a right to do so because of its customers' demands for interchangeability.

Thus, even if the court had concluded that Dorr–Oliver's clamshell design was not inherently distinctive, Dorr–Oliver would be entitled to trade dress protection because it is abundantly clear that the design had acquired secondary meaning prior to Fluid–Quip's entry into the market.

### C. Likelihood of Confusion

In light of the court's earlier finding, and the parties' subsequent stipulation, that there was no actual confusion at the point of sale as to the source of Fluid–Quip's clamshell, the issue of likelihood of confusion posed the greatest challenge to Dorr–Oliver's trade dress infringement case. In *Smith Fiberglass Products, Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir.1993), the Seventh Circuit identified the following factors be considered in determining whether there is a likelihood of confusion: (1) the similarity of the trade dress; (2) the similarity of the products to which those trade dresses are attached; (3) the area and manner of current consumer use; (4) the degree of care likely to be exercised by consumers in making their purchasing decision; (5) the strength of Dorr–Oliver's trade dress; (6) actual confusion among customers; and (7) the intent of the alleged infringer "to palm off his product as that of another."

■ The thrust of defendants' argument is that there is no likelihood of confusion because of the time taken and the expertise employed by the customers at the point of sale of the clamshell. The Seventh Circuit recognizes, however, that the Lanham Act applies to the likelihood of post-sale confusion of "prospective" or "potential" purchasers, not only point-of-sale purchasers. *Fo-*

---

11. American Maize is a corn wet milling processing company that has been and is currently one

of plaintiff's customers.

*rum Corp. of Northern America v. Forum Ltd.,* 903 F.2d 434, 442 (7th Cir.1990); *International Kennel Club, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1081 (7th Cir.1988). The court agrees with our brethren in this district that "the Lanham Act is not limited to preventing confusion at the time of sale, but also to preventing confusion that occurs after the sale." *Storck USA, L.P. v. Farley Candy Co.,* 797 F.Supp. 1399, 1410 (N.D.Ill.1992) (Judge Holderman); see also, *Eldon Industries, Inc. v. Rubbermaid, Inc.,* 735 F.Supp. 786, 821 (N.D.Ill.1990) (Judge Rovner).

▪ In the instant case, Fluid–Quip demonstrated that the purchase of a clamshell can take months or even years to consummate, during which time potential buyers and sellers participate in numerous technical discussions and presentations. This is why there is no possibility of confusion by the purchaser at or near the point of sale. The court finds, however, that there is a likelihood of confusion by potential purchasers resulting from the near identical appearance of Fluid–Quip's and Dorr–Oliver's clamshells.

First, Dorr–Oliver demonstrated that it is a common practice in the corn wet milling industry to conduct tours of potential customers, plant managers and engineers through the plants to view the milling process, including the starch washing process. It is highly probable that many of these people, including potential customers from Asia and other foreign countries, would be unable to distinguish Fluid–Quip's clamshells from Dorr–Oliver's when viewing a starch washing line. Fluid–Quip's name was cast into each of the eight parts of the outer housing; Dorr–Oliver's name appeared on only the largest part on each side. Both manufacturers affixed small name plates to the central core of their units. However, these names would not be readable at any distance, and one of the photographs introduced by Dorr–Oliver showed a grouping of clamshells many of which were covered by corn starch dust, making the names even harder to discern.

Moreover, as parts of the outer housings of the units are interchanged, it would become impossible to identify the source of any particular machine without close inspection to see whose name, if any, was embossed on the parts. For example, it is likely that one would expect to find a clamshell with one of the two halves Fluid–Quip's and the other Dorr–Oliver's, or a unit with one or both Dorr–Oliver outer housings on a Fluid–Quip core. If such a customer were to view the latter unit experiencing mechanical problems, that customer might attribute those problems to Dorr–Oliver, when the fault might well lie with Fluid–Quip's product. Because Fluid–Quip's clamshell is practically identical to Dorr–Oliver's in outward appearance, confusion as to source is a near certainty.

▪ The root of the Lanham Act is to prohibit unfair competition. It is inherently unfair for a competitor to enter the market on the back of the originator of a design. Both Seventh Circuit and Illinois state law impose a duty of care on newcomers to a market to take affirmative steps to choose trade dress that avoids confusion. *Pride Communications v. WCKG, Inc.,* 851 F.Supp. 895, 30 U.S.P.Q.2d 1185, 1191 (N.D.Ill.1994), citing *Forum Corp.,* 903 F.2d at 443; *Thompson v. Spring–Green Lawn Care Corp.,* 126 Ill.App.3d 99, 111, 81 Ill.Dec. 202, 212, 466 N.E.2d 1004, 1014 (1st Dist. 1984). See also, *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274–276 (7th Cir.1976) (a trademark owner has the "right" to maintain control of his reputation regardless of source confusion).

The court finds the Second Circuit's opinion in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2nd Cir.1986), highly persuasive. In *Lois Sportswear,* the appellant copied Levi's stitching design on its jeans. The appellee argued that there was no likelihood of confusion because the jeans were clearly labeled (some permanent labels, some temporary), and when customers came into the store to buy the jeans they knew whose product they were purchasing. The court held:

> [I]t is equally clear that post-sale confusion as to source is actionable under the Lanham Act ... In the instant case, this post-sale confusion would involve consumers seeing appellant's jeans outside of the retail store, perhaps being worn by a passer-

by. The confusion the Act seeks to prevent in this context is that a consumer seeing the familiar stitching pattern will associate the jeans with appellee and that association will influence his buying decisions.

*Id.* at 872.

Johnson, Dorr–Oliver's structural engineering expert, made three variations of models (the "Johnson Variations") that would be completely interchangeable with Dorr–Oliver's clamshell but the design of which was sufficiently different to distinguish the product to potential customers. It is inconceivable that Dorr–Oliver's bagel-like design was the only possible design.[12] While these models may have incurred an additional cost, this expense was minimal in relation to the price of the unit. Defendants' argument that the extra cost would prohibit their ability to compete in the market is not persuasive.

At the time defendant entered the market Dorr–Oliver's clamshell was selling for approximately $40,000. Fluid–Quip's clamshell was offered for roughly half that price. Defendants' expert testified that a clamshell could be designed with a distinguishable design from Dorr–Oliver's clamshell that is fully interchangeable with Dorr–Oliver's clamshell, is the functional equivalent, and can compete in the $30,000–40,000 price range. Based on the facts in this case, the court finds that defendant had the duty to distinguish its product from that of Dorr–Oliver's clamshell. See, *Radio Shack Corp. v. Radio Shack, Inc.*, 180 F.2d 200, 206 (7th Cir.1950) ("the wrong in this case consists in a realization on the plaintiff's general reputation—an appropriation of plaintiff's good will by confusing the minds of prospective customers as to the identity of the dealer who is offering the goods to the public").

### D. *Functionality*

■ Functionality is a traditional affirmative defense to trade dress infringement. See, *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338 (7th Cir.1985). In the instant case, defendants have the burden of proving that the outer housing design of Dorr–Oliver's clamshell is functional. *Computer Care*, 982 F.2d at 1068. A design is functional "if it is one of a limited number of equally efficient options available to competitors *and* free competition would be unduly hindered by according the design trademark protection." *Two Pesos*, 505 U.S. at ——, 112 S.Ct. at 2760–2761 (emphasis added).

Following the Supreme Court's opinion in *Two Pesos*, the Seventh Circuit elaborated on this concept:

> Put another way, a functional feature is one that would be found in most or all brands of the product even if no producer had any desire to have his brand mistaken for that of another producer. It is a feature, such as the oval shape of a football, that competitors would find necessary to incorporate into their product in order to be able to compete effectively.

*Computer Care*, 982 F.2d at 1071 (internal citations omitted).

■ Unlike the oval shape of a football that is necessary to allow a quarterback to throw a perfect spiral, the shape of the outer housing of Dorr–Oliver's clamshell does not inhibit the perfect separation of the corn slurry.[13] Franko testified that Fluid–Quip has other products that perform the exact same function as its clamshell that have completely different outer housings. In fact, Franko testified that another Fluid–Quip corn starch-washing machine that performs the same process as the clamshell has a

---

12. Based on the testimony of Dr. Bouchillon, defendants' expert, defendants argue that the Johnson Variations would have cost approximately $300.00 more for the added steel that would be needed to have sharp edges versus the rounded outer housing. Defendants also argued that one of the hatch variations may have added extra weight to the unit that would make it more difficult to service. However, Bouchillon further testified that the hatches in the other two Johnson Variations would not be heavier than Dorr–Oliver's clamshell hatch. Further, the old hatch-

es could have been used with a squared outer-housing or an over-housing that was painted.

13. The court does not belittle the pleasure the sight of Dorr–Oliver's clamshells has on some people. Dorr–Oliver's expert testified that when he heard the term clamshell he thought of a "beautiful array of equipment." He further testified that when he saw other starch washing machines that were a different shape he "missed [his] old friend [the clamshell]."

completely different outer housing, and is outselling Fluid–Quip's clamshell model.

But, argue defendants, the customers demanded interchangeability with Dorr–Oliver's clamshell and therefore, in order to compete effectively, defendants had to copy Dorr–Oliver's design. This argument is questionable because defendants have shown that they are now competing with a different shaped product.[14] However, addressing this argument the evidence before the court does not support the functionality test in *Two Pesos:* that Dorr–Oliver's trade dress was one of a limited number of equally efficient options available to Fluid–Quip and that Fluid–Quip's right to compete would have been unduly hindered by according Dorr–Oliver's clamshell trade dress protection. 505 U.S. at ——, 112 S.Ct. at 2760–2761.

When soliciting bids from Fluid–Quip, the customers requested that the clamshell have 480 cyclonettes, be "interchangeable" with the Dorr–Oliver's clamshells, and be able to "fit in" or be "used in place" of Dorr–Oliver's clamshells. In preparing the Johnson Variations, described above, Johnson was told that he could not deviate from the exact internal configuration whatsoever. As to the external shell, he was told that the inner dimensions of the shell must remain the same and only external non-functional details could be changed. The parties agree that the models would have been completely mechanically interchangeable with Dorr–Oliver's clamshell, yet the design was distinct enough to distinguish the product.

Further, Mr. Franko testified, and pictures from an unidentified plant show, that the clamshells could have been painted to distinguish themselves. Defendants could also have embossed stripes or cross hatching on the outer casing to create a distinguishable appearance. While these changes may have

incurred additional costs, the expense would have been minimal in relation to the price of the unit, and would not have prohibited Fluid–Quip's ability to compete effectively in the clamshell market.

To compete in the clamshell market the customers looked at price, delivery time, and quality of the product. (Kampfe p. 23; Johnson p. 14) The only factor that the variations described above would effect would be price. At the time defendants entered the clamshell market Dorr–Oliver's clamshell was selling for approximately $40,000. Defendants' first set of clamshells sold for roughly half that price, approximately $19,500 each. When asked how much the added materials would cost to square off the unit and allow for any of the Johnson hatch Variations, defendants' expert estimated an added cost of roughly $300 per unit. Even doubling that cost, the defendants could effectively compete with Dorr–Oliver's clamshell.[15]

The most damaging evidence to defendants' functionality argument is the testimony of its' expert, Dr. Bouchillon. The court commends Dr. Bouchillon's professional, extremely credible expert testimony. When asked directly, Dr. Bouchillon testified that a distinguishable clamshell could have been designed that is fully interchangeable, functionally equivalent, and competitive in the price range in which Dorr–Oliver was selling its clamshell at the time defendants entered the market. Even accepting a "functional" argument extended to include a requirement of complete interchangeability with Dorr–Oliver's clamshell, based on the evidence presented, defendants' functionality defense fails.

At trial defense counsel repeatedly argued that defendants had no reason to design a product that would have distinguished itself from Dorr–Oliver's and still be competitive

---

**14.** Based in part on this evidence, it is evident that defendants gained access to the corn starch washing machine market and were able to build customer trust through copying plaintiff's product.

**15.** Defendants argue that they were unaware of the price of plaintiff's clamshell when they entered the market. However, there would have been no extra costs if the original outer casing

molds would have been designed with cross-hatching. Also, the issue is whether in fact they could effectively compete, not if they thought they could compete. Further, Franko bid for the contract before he manufactured a single unit and conceded that the customers would have let him know if Fluid–Quip's price was not competitive.

because they did not know that they were infringing on Dorr–Oliver's trade dress rights. Ignorance of the law is no excuse, and certainly feigned ignorance of the law is no excuse.[16] Franko admits that he had worked with patents and was familiar with basic trademark law. He was also concerned enough to discuss the matter with legal counsel. In his discussions with counsel, while they were extremely brief, Franko was told that he could not copy another product if there would be a likelihood of confusion.

■ Mr. Franko was a very credible witness, and while the court finds that there was no intent to sell his product under the guise that it was Dorr–Oliver's equipment, the court finds that Franko did have intent to copy and market a product that was substantially similar to Dorr–Oliver's clamshell. Fraudulent intent or bad faith is not essential to prove trade dress infringement under the Lanham Act. *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir.1983) (fraudulent intent is not necessary where likelihood of confusion already exists; where there is proof of intentional copying, one can infer the likelihood of confusion). There is no dispute that defendants knew that there were laws against copying another company's trademarks or trade dress. Having found that Dorr–Oliver's clamshell trade dress is not "functional," the court finds that defendants have violated Dorr–Oliver's rights under the Lanham Act.

E. **Plaintiff's State Law Claims under Illinois Common Law, The Illinois Uniform Deceptive Trade Practices Act and The Illinois Consumer Fraud and Deceptive Trade Practices Act**

16. This argument is more relevant to the court's determination of "bad faith."

17. Section 510/2 provides in part:
A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:
(1) passes off goods or services as those of another;
(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

■ The above-stated findings under the Lanham Act support Dorr–Oliver's claims under the Illinois common law of unfair competition. *Sign of Beefeater*, 540 F.2d at 274 fn. 16 (facts that support liability under the Lanham Act prove liability for unfair completion under Illinois common law). Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act: (1) whether plaintiff has a protectable trade mark or trade dress; and if so, (2) whether the alleged infringer's use of a similar mark or dress brings about a likelihood of confusion. *Thompson v. Spring–Green Lawn Care Corp.*, 126 Ill.App.3d 99, 104–105, 81 Ill.Dec. 202, 208, 466 N.E.2d 1004, 1010 (1 Dist.1984) (because state and federal statutes neither create a valid trademark nor establish new rights, courts apply the same principles and tests for infringement of trademark law under state statutes, federal statutes, and Illinois common law claims); *Spex Inc. v. Joy of Spex, Inc.*, 847 F.Supp. 567 (N.D.Ill.1994), citing, *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983); *Pride Communications v. WCKG, Inc.*, 851 F.Supp. 895, 901 (N.D.Ill.1994).

■ Similar to the Lanham Act, the Illinois Deceptive Trade Practices Act prohibits actions that cause a likelihood of confusion. 815 ILCS 510/2 (1993).[17] The findings above support Dorr–Oliver's claim against defendants pursuant to this Act. *Soft Sheen Products, Inc. v. Revlon, Inc.*, 675 F.Supp. 408, 415 (N.D.Ill.1987) (plaintiff must prove the same elements to prevail under both the Lanham act and the Illinois Deceptive Trade Practices Act: (1) that plaintiff has protectable rights in its trade dress; and (2) use by the defendant in commerce of its product's

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

. . . . .

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

trade dress is likely to result in confusion, mistake or deception).

 Section 2 of the Illinois Consumer Fraud Statute forbids unfair or deceptive acts or practices in the conduct of any trade or business with the intent that others rely on the deceptive practices. 815 ILCS 505/2 (1993)[18]. The statute incorporates the definition of "deceptive trade practice" set forth in the Uniform Deceptive Trade Practices Act. *Id.* To fall within the purview of the Act, it need only be shown that the defendant is engaged in a trade or commerce, and that he has committed unfair or deceptive acts or practices in the conduct of that trade or commerce. *Affrunti v. Village Ford Sales, Inc.*, 232 Ill.App.3d 704, 707, 174 Ill.Dec. 30, 32, 597 N.E.2d 1242, 1244 (3rd Dist.1992). The findings supporting Dorr–Oliver's claims under the Lanham Act support its claim that defendants violated § 505/2.

### F. *The Illinois Counterfeit Trademark Act*

 The Illinois Counterfeit Trademark Act proscribes the "counterfeit or imitation"

18. Section 505/2 provides in part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby . . .

19. § 1040/1 provides:

For the purposes of this Act, unless otherwise required by the content:
"Trade-mark" means anything adopted and used by a person to identify goods made, sold, produced or distributed by him or with his authorization and which distinguishes them from goods made, sold, produced or distributed by others.

20. § 1040/2 provides in part:

Whoever counterfeits or imitates any trade-mark of which he is not the rightful owner or in any way utters or circulates any counterfeit or imitation of such a trade-mark or knowingly uses such counterfeit or imitation . . . shall be guilty of a Class A misdemeanor for each of-

of another's trade dress.[19] 765 ILCS §§ 1040/2[20] and 1040/3.[21] Section 1040/7 of the Act allows civil redress for the actions proscribed in §§ 1040/2 and 1040/3.[22]

 In *People v. Revlon,* the Illinois Appellate Court held that the term "counterfeit" as used in this Act requires an intent to deceive. 99 Ill.App.2d 463, 473, 241 N.E.2d 554 (1st Dist.1968). The court noted that the term "counterfeit" "includes the element of deception arising from the misrepresentation of identity." *Id,* at 471, 241 N.E.2d 554. The court held that mere imitation is not enough to establish misconduct under the Act. Imitation in connection with other acts that misrepresent the seller's identity, however, constitutes deception. *Id.,* 99 Ill. App.2d at 472, 241 N.E.2d 554. In interpreting these statutes, this court is bound by state court precedent and, in the absence of a decision by the highest state court, the decisions of the intermediate appellate court generally control. *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561, 574 (7th Cir.1993).

fense. For purposes of this Section, each sale shall be deemed an offense.

21. Section 1040/3 provides in part:

Every person who shall knowingly use or display a trade-mark or trade name of which he is not the lawful owner in any manner not authorized by such owner, whether or not the unauthorized use creates a likelihood of confusion or misunderstanding, (a) in the sale of goods produced by the owner, but with alterations in packaging or labeling, or (b) in the sale of goods produced by the owner but in a packaging form not intended by him for such sale, or (c) in the packaging or labeling of goods not produced by the owner, if the trade-mark or trade name of the owner is used for the purpose or with the effect of exploiting or impairing the owner's good will or as a means of representing a quality, property or characteristic of the goods being sold, other than the utility of the goods in the repair or as a replacement of a component of the product of the owner and the trade-mark or trade name is used in a non- misleading manner solely to indicate such utility, shall be deemed guilty of a Class A misdemeanor.

22. Under § 1040/7, "[a]ny person who commits or participates in any act prohibited by any of the provisions of Sections 2, 3 or 4 of this Act shall be liable to any person injured . . . in a civil action for redress . . ."

The facts in the instant case do not show that defendants intended to deceive customers as to the source of the product. At trial, Dorr–Oliver's sales manager explained the general sales process for the industry: (1) customers would discuss their future plans with a sales engineer who would then provide information on equipment necessary for the customer's projected future needs; (2) at this stage the supplier would provide the customer with a preliminary proposal; and (3) later, as the project matures, firm proposals are submitted to the customer accompanied by follow-up visits to several people in the customer's plant. These meetings would be held with upper level management and engineers in the plants.

In addition to the evidence that misrepresentation would be unlikely in light of the sales process that generally occurs and the sophistication of the parties involved, there is no evidence that defendants ever attempted to misrepresent themselves or their product to any customers. The parties submitted the testimony of two customers' representatives, who testified unequivocally that Fluid–Quip never misrepresented the source of its product, and fully represented that it was not sponsored, affiliated with, or licensed, by Dorr–Oliver.

There is no evidence that defendants had an "intent" to deceive customers about the source of their product. While under some circumstances the copying of another's overall trade dress may be a "glaring indication" of deceptive intent, the court finds that under the facts in this case Dorr–Oliver has failed to prove the necessary intent to support its claim under the Illinois Counterfeit Trademark Statute. See, *Wilton Industries v. Pfeil & Holding, Inc.*, (N.D.Ill.1994)

### V. Relief

■ In its oral ruling on April 13, 1995, the court held that because there was no proof of any actual customer confusion, Dorr–Oliver was not entitled to recover "actual damages" under the Lanham Act § 1117 [23]. See, *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561, 575 (7th Cir.1993); *Web Printing Controls Co. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1204–05 (7th Cir.1990); *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982). The ruling extends to plaintiff's actions brought pursuant to the Illinois Deceptive Trade Practices Act and Common Law Unfair Competition Claims. *Joseph J. Legat Architects, P.C. v. United States Development Corp.*, 1991 WL 38714 *15 (N.D.Ill., 1991).

■ Because Dorr–Oliver has prevailed on its claims that defendants violated its trade dress rights under the Lanham Act, Illinois common law, and Illinois statutory law, however, other avenues of relief are available to compensate Dorr–Oliver for its losses. Equitable relief in the form of a monetary award is based on proof of defendant's unjust enrichment and the need for deterrence. *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir.1990). Awards of a violator's profits are limited by "equitable considerations," among which is whether a defendant acted in "bad faith." *Sands, Taylor & Wood v. The Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir.1992).

■ Under § 1117 the court is authorized to award attorneys' fees in "exceptional cases." An exceptional case "is one in which the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 547 (7th Cir.1988); *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 941 (7th Cir.1989), cert. denied, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Defendant Franko's customers testified that they asked him to bid on a product that would be interchangeable with Dorr–Oliver's clamshell. Franko asked two of his attorneys whether

---

**23.** § 1117 provides in part:

(a) Profits; damages and costs; attorney fees
 When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ... to recover (1) defendant's

profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction ... Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

this could be done lawfully and was basically told that so long as he did not cause any customer confusion he would be able to produce a product that was similar to Dorr–Oliver's product. Franko had "Fluid–Quip" embossed on almost every part of its clamshell to identify the unit and each outer component as Fluid–Quip's. In addition, defendants determined that Dorr–Oliver's patents had expired.

In all of the negotiations and sales meetings, the customers testified that Franko and Fluid–Quip's representatives made it clear that they were not sponsored or in any way affiliated with Dorr–Oliver. Further denying any misrepresentations, Franko testified that allowing customers to believe that defendants were in any way associated with Dorr–Oliver would have been very "counter-productive to our sales effort," because the customers were looking for an alternative supplier and competitor, and he had heard that customers were experiencing quality problems with Dorr–Oliver's products. "For me to try to associate myself with Dorr–Oliver would have been rather foolish." [Trial: Franko V. 3, p. 284]

Dorr–Oliver argues that defendants' actions were in bad faith because they were put on notice of their violation in a letter dated June 11, 1992. The letter warned defendants that they "may be employing technology protected by one or more of Dorr–Oliver's [patents]." Franko testified that he told his attorney the patent numbers listed in the letter and was told that the patents had expired. The letter never asserted that Dorr–Oliver had any protectable trade dress rights in the clamshell's outer housing. Defendants' refusal to cease using the mark upon demand is not necessarily indicative of bad faith. Absent more, courts should "not make an inference indicative of bad faith from evidence of conduct that is compatible with a good faith business judgement." *Sands,* 978 F.2d at 962, citing, *Munters Corp. v. Matsui America, Inc.,* 730 F.Supp. 790, 799–800 (N.D.Ill.1989), aff'd, 909 F.2d 250 (7th Cir.1990). Based on the evidence before it, the court finds that defendants' actions were not malicious, fraudulent, deliberate or willful, and therefore declines to award

Dorr–Oliver its attorney's fees. *Sands,* 978 F.2d at 962, quoting, *Nalpac, Ltd. v. Corning Glass Works,* 784 F.2d 752, 755 (6th Cir. 1986).

■ Dorr–Oliver seeks prejudgment interest on the court's award of defendant's profits. Prejudgment interest "should be presumptively available to victims of federal law violations. Without it, compensation is incomplete and the defendant has an incentive to delay." *Sands, Taylor & Wood Co.,* 978 F.2d at 963 (7th Cir.1992), citing, *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989). Dorr–Oliver is therefore entitled to prejudgment interest.

■ Dorr–Oliver's demand for punitive damages is denied. Because the court has previously held that Dorr–Oliver is precluded from an award of actual damages, it is also precluded from an award of punitive damages. *Joseph J. Legat Architects, P.C.,* 1991 WL 38714 *15. This applies to all of Dorr–Oliver's claims under the Lanham Act and Illinois statutory and common law. *Id.; By-Prod Corp. v. Armen–Berry Co.,* 668 F.2d 956, 961–62 (7th Cir.1982) (discussing Illinois law); *McGrew v. Heinold Commodities, Inc.,* 147 Ill.App.3d 104, 110, 100 Ill.Dec. 446, 453, 497 N.E.2d 424, 431 (1st Dist.1986).

Accordingly, the court concludes that Dorr–Oliver is entitled to the following relief:

A. An equitable award of defendants' profits as a measure of unjust enrichment;

B. Prejudgment interest; and

C. An injunction prohibiting defendants from further infringement of Dorr–Oliver's trade dress in the design of the outer housing of its clamshell starch washers.

By minute order dated July 11, 1995, the court requested post-trial briefs on the issue of relief. Specifically, the court wishes the parties to address, by specific reference to the trial record, the calculation of defendants' profits, the rate of prejudgment interest to be applied, and the appropriate language to be included in the injunction. Simultaneous briefs on these issues shall be filed in chambers on or before August 31, 1995.

APPENDIX A